# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN J. HANNA as SPECIAL PERSONAL REPRESENTATIVE OF THE ESTATE OF MINOR D.A. and CONSERVATOR FOR MINOR SIBLINGS M.A. and J.A., IN THEIR INDIVIDUAL CAPACITY AND AS HEIRS OF D.A.'s ESTATE, | Civil Action No.: |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF CHILDREN AND FAMILY SERVICES, DCF SOCIAL WORKER CONEICAO PEREIRA; DCF SOCIAL WORKER JANE OR JOHN DOE, DCF ONGOING SUPERVISOR JANE OR JOHN DOE, DCF FALL RIVER AREA OFFICE PROGRAM MANAGER JANE OR JOHN DOE, DCF AREA CLINICAL MANAGER JANE OR JOHN DOE, DCF FALL RIVER AREA OFFICE AREA DIRECTOR JANE OR JOHN DOE, DCF FOSTER CARE REVIEW UNIT JANE AND JOHN DOE, and UNKNOWN DOES, GOVERNOR MAURA HEALEY, SECRETARY OF HEALTH AND HUMAN SERVICES KATE WALSH, COMMISSIONER OF DCF LINDA SPEARS, FALL RIVER SCHOOLS SUPERINTENDANT MARIA PONTES, FALL RIVER PUBLIC SCHOOL SYSTEM, | |
| Defendants. | |

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff Stephen J. Hanna as Special Personal Representative of the Estate of Minor D.A.

and as Conservator for Minors J.A. and M.A., in their individual capacity and as heirs of the estate

of D.A., hereby bring this Complaint and demand for a jury trial against the Commonwealth of Massachusetts, the Department of Children and Family Services, and the Fall River Public Schools, including the named employees and other employees, agents, and servants of these entities in their individual and official capacities. Plaintiff seeks compensation, both compensatory and punitive damages pursuant to Massachusetts wrongful death statute, general negligence, violations of Title II of the Americans with Disabilities Act, Constitutional violations and infliction of emotional distress.

## **<u>INTRODUCTION</u>**

This case involves the most egregious failures at nearly every level by the Department of Children and Families ("DCF") and the Fall River Public School System ("FRPS"). As a result of multiple failures, Defendants are responsible for the October 21, 2021 tragic and tortuous death of 14-year-old autistic D.A. and the horrific injuries and abuse to his autistic triplet brothers, M.A. and J.A. From the time that DCF took custody of the children in October 2017, DCF failed to provide appropriate care and protection in violations of its own regulations and consistently ignored numerous warning signs that the children were at risk of further harm. While under DCF supervision and custody, DCF and FRPS had multiple affirmative duties to protect, provide care, supervise, provide accommodations, and to provide clinical evaluation and case planning, among other duties, which they utterly failed to provide for any of these vulnerable autistic boys.

Years before D.A. died in 2020, DCF had been on notice of the grave safety risks the boys faced in the home of the boys' father, John Almond, and his girlfriend, Jaclyn Coleman, as they had been removed from their care previously by DCF. DCF and its agents and employees were aware of Almond and Coleman's lifelong history with the Department as once being in custody themselves as children, and later as parents.

2

After only a few months of the children being in DCF custody, DCF and its agents accelerated the process of reunification prematurely. DCF and its agents were aware that Almond and Coleman failed to engage in services and tasks required in their Action Plan to appropriately reunify with the children. Almond and Coleman announced their concerns to DCF that they were not prepared to be reunited as they were not able to find an apartment with an adequate amount of space for the three pre-teens with diagnosis of autism spectrum disorder, two adults and their infant. Service providers also voiced their concerns to DCF that the reunification process was moving too quickly for the children's individual needs. Furthermore, a Juvenile Court judge found Almond unfit to care for the triplets and that the children were still in need of care and protection of the court and DCF. Despite these alarming red-flags and outright warnings, DCF chose to place the boys with Almond and Coleman in an overcrowded one-bedroom apartment in Fall River, MA.

Once the boys were placed back into the home, while still in the custody of and under supervision of DCF, the agency and its employees were deliberately indifferent to obvious signs of further physical abuse and neglect that were reported to them multiple times, some by mandated reporters. DCF failed to act on the reports causing for the children to endure further trauma and harm.

Between March 2020 and October 2020, D.A. and M.A. were enrolled in FRPS. FRPS utterly failed to provide any, let alone adequate, special education and accommodations, incorporated in their Individual Education Plans, or resources to the family. Had they provided educational services to both children and ensured they were in attendance and meeting their educational goals, FRPS would have been alerted to clear signs that the children were living in squalor and being severely neglected and horrifically abused in their home. FRPS utterly failed in

their duties to D.A. and M.A., resulting in significant pain and suffering, and ultimately, D.A. premature and wrongful death.

As a result of the negligence of both DCF and FRPS, D.A. suffered a slow, painful death caused by starvation. On October 21, 2020, an emergency response team responded to Mr. Almond and Ms. Coleman's home to find D.A.'s lifeless body in the middle of the deplorable, drug-infested one-bedroom apartment. D.A., along with M.A. who was found also severely malnourished and battered, were taken by ambulance to a local hospital where tragically, D.A. was pronounced deceased at the young age of fourteen years old. These brothers lost their third triplet at only fourteen years of age through the gross negligence, misconduct, and deliberate indifference of the very organizations who were tasked and entrusted with their protection, care and education.

## JURISDICTION AND VENUE

1.      This action includes claims under 41 U.S.C. §1983 and §1988, Title II of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1970. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§2201-2202. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

2.      Venue is appropriate in the Eastern District of Massachusetts pursuant to 28 U.S.C. § 1391 as several of the parties reside in eastern Massachusetts, and a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

## PARTIES

3.      Plaintiff Stephen J. Hanna is a resident of Sumter County, Florida. He is the Special Personal Representative for the Estate of D.A. and is Conservator for minors M.A. and J.A.

4.      Minor decedent Plaintiff, D.A. was a resident of Fall River, Massachusetts prior to his death on October 21, 2020.

4

5.      Plaintiff M.A. is a minor and is a resident of Essex County, Massachusetts.

6.      Plaintiff J.A. is a minor and is a resident of Norfolk County, Massachusetts.

7.      The Defendant Department of Children and Families ("DCF") is a state governmental entity doing business at 600 Washington Street, Boston, Suffolk County, Massachusetts.

8.      Upon information and belief, John and Jane Does are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

9.      DCF Social Worker CONEICO PEREIRA at all relevant times, was employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

10.      DCF Social Worker Jane or John Doe, whose names will be known through discovery, are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

11.      DCF Supervisor Jane or John Doe, whose name will be known through discovery, are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

12.      DCF Fall River Area Office Program Manager Jane or John Doe, whose name will be known through discovery, are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

13.      DCF Area Clinical Manager Jane or John Doe, whose name will be known through discovery, are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

14.     DCF Fall River Area Director Jane or John Doe, whose name will be known through discovery, are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

15.     DCF Foster Care Review Unit Members Jane or John Doe, whose name will be known through discovery, are employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

16.     Paragraphs 7-14 are collectively referred to as "DCF Defendants" or "DCF."

17.     Defendant MAURA HEALEY is Governor of the Commonwealth of Massachusetts and is sued solely in her official capacity. Pursuant to Part II, Chapter II, Section 1, Article 1 of the Constitution of the Commonwealth of Massachusetts, the executive power of the Commonwealth is vested in the Governor. Under M.G.L. c. 6A §§2 and 4, the governor has the ultimate authority to direct and control the operation of EOHHS and DCF. Governor Healey currently maintains her principal office at the Massachusetts State House, Office of the Governor, Room 280, Boston, Massachusetts, 02133.

18.     Defendant KATE WALSH, Secretary of Health and Human Services for the Commonwealth of Massachusetts and leader of the Executive Office of Health and Human Services ("EOHHS") is sued solely in her official capacity. EOHHS is created under M.G.L. c. 6A §2 and under M.G.L. c. 6A §16 and is vested with the duty to administer the Commonwealth's human services programs, including the child welfare operations of DCF. Pursuant to M.G.L. c. 6A §3, the secretary is the head of EOHHS and is appointed by the governor. Secretary Walsh currently maintains her principal office at One Ashburton Place, 11th Floor, Boston, Massachusetts 02108.

19.     Defendant LINDA SPEARS is the commissioner of DCF and is sued solely in her official capacity. DCF is created under M.G.L. c. 18B §1 and is vested with the duty to administer a "comprehensive child welfare program for children and families." Pursuant to M.G.L. c. 18B §6, the commissioner is the executive and administrative head of DCF, and is appointed by the secretary of EOHHS, with the approval of the governor. Commissioner Spears currently maintains her principal office at 24 Farnsworth Street, Boston, Massachusetts 02210.

20.     Paragraphs 16-19 are collectively referred to as "Commonwealth Defendants."

21.     The Defendant FALL RIVER PUBLIC SCHOOLS ("FRPS") is a local governmental entity doing business at 417 Rock Street, Fall River, MA 02720.

22.     Defendant MARIA PONTES is the superintendent of the FRPS and is sued solely in her official capacity.

23.     Paragraphs 20-21 are collectively referred to as "FRPS Defendants."

24.     Unknown Does whose identities will only be known after conducting discovery.

### Notice of Presentment Properly Served

25.     The Commonwealth of Massachusetts, Massachusetts Executive Office of Health and Human Services, Massachusetts Department of Children and Families, the City of Fall River, and Fall River Public Schools, referencing liable officers, employees and agents, have been properly served with a Notice of Presentment within the time limit proscribed by M.G.L. c. 258 §4.

26.     Said presentment was made on October 20, 2022.

# FACTS

### *The Triplets are In and Out of the Child Welfare and Protection System During their Early Childhood in New York.*



27.     Triplets D.A., M.A. and J.A. were born on February 25, 2006 in Syracuse, New York to Sarah Dawes Almond and John Almond.

28.     At age two, the triplets were each diagnosed with autism spectrum disorder.

29.     Soon after birth, the New York Office of Child and Family Services ("OCFS") removed the boys from their parents' custody and placed the triplets with their maternal grandparents, Boy and Linda Dawes, for a short period of time before reunifying them with their parents.



30.     Over the next seven years, the triplets were removed from their parents' custody by the New York Office of Child and Family Services ("OCFS") a total of three times.

31.     These removals stemmed from their parents' substance abuse, deplorable living conditions, medical neglect, inability to provide adequate supervision, and lack of basic care.

32.     During this time, the triplets had reprieve when living with Mr. and Mrs. Dawes for three years.

33.     Almond moved to Massachusetts in 2013 and had very limited contact with his sons who remained in New York OCFS custody.

34.     Following several attempts to reunify the children with their mother, and in an effort to incentivize the mother to engage in services so that the children could be returned to her, the children's attorneys, OCFS counsel, OCFS social workers, and the presiding judge determined the children be placed in non-kin foster home.

35.     Reluctantly, the Dawes had little choice, and were persuaded it would motivate their daughter to engage in services and establish proper housing to reunify their daughter, or them, with their grandsons.

36.     During the transition to a non-kinship placement, the Dawes remained consistent caregivers of the boys and frequently had them in their home unsupervised for weekends, and at times transported them to and from school and to doctors' appointments.

37.     The triplets were able to reunify with their mother for a brief amount of time until OCFS had to removed them from her care for the last time in 2016.

38.     Around the same time, in 2016, the triplets' father, John Almond ("Almond") resurfaced and began visiting with the children and attending court hearings.

39.     All parties, including OCFS, the Dawes, and the presiding Family Court Judge agreed that Mr. Almond, now sober and re-engaged in the boys' lives, appeared fit to care for the children.

40.     In September 2016, a New York court awarded Almond full custody of the boys. Shortly thereafter, the Dawes helped transport the children to join Almond in Fall River, Massachusetts.

41.     A month later, Mr. and Mrs. Dawes rented rooms at a Massachusetts hotel to visit the boys with the children's mother, Almond, and his pregnant girlfriend, Jaclyn Coleman ("Coleman"). The visit appeared to go well as the family played in the indoor pool and ate together.

42.     Almond agreed to allow Mr. and Mrs. Dawes to visit the boys monthly and so they planned to drive up to Massachusetts from New York, every few weeks to visit their grandchildren.

43.     Unfortunately, this visit to the hotel in roughly October 2016 was the last time Mr. and Mrs. Dawes saw D.A. alive.

44.     The Dawes attempted to reach Almond numerous times for years, via telephone, social media and through relatives but were unsuccessful.

45.     Mr. and Mrs. Dawes were never provided Almond's address therefore were not able to locate their grandchildren.

### Nine Months Later in 2017 MA DCF Removes the Boys From Almond's Care Due to Abuse, Neglect, and Unsanitary Conditions

46.     In June 2017, the Massachusetts Department of Children and Families received a report of abuse and neglect concerning Almond and Coleman's treatment of the triplets. The report stated that Almond and Coleman were abusing substances, neglecting to provide the children with medical care, neglecting to ensure that they attended school, and that there were unsanitary conditions in the home.

47.     In August 2017, the DCF Fall River Area Office ("FRAO") opened the current child protection case to monitor the family due to Coleman's substance use, and concerns for Almond and Coleman's ability to meet the needs of their newborn and the triplets.

48. In October, 2017, the triplets and their infant brother, A.A. were removed from the home of Almond and Coleman due to allegations of neglect and physical abuse of the children, parental substance use, unsanitary conditions of the home, medical neglect, and the triplets' excessive absences form school.

49. Upon information and belief, at the time of the removal M.A. had a fractured arm and J.A. had an injury to his genitals. Both children were transported to a hospital in Rhode Island to be evaluated by a Forensic Child Abuse and Trauma team.

50. This marked the fourth time the triplets were removed from parental custody by a state child welfare agency.

51. Following their removal, the triplets were first placed in a foster home where the primary language was Spanish despite the fact that the triplets were, upon information and belief, unable to communicate in Spanish.

52. Later DCF moved the boys to the Devereux School, a congregate care placement for individuals with intellectual disabilities and autism spectrum disorder.

53. According to DCF's Permanency Planning Policy, as soon as the children had come into the Department's custody, the Department was required to alert all known kin of the children's removal to initiate a long-term plan for permanency and to facilitate potential placement with kin.

54. However, neither Mr. and Mrs. Dawes, the children's mother, nor any other kin were contacted by DCF or anyone.

55. None of the triplets' maternal relatives were aware that the children were in the custody of DCF or in a foster home.

*Throughout 2018 and 2019 Almond and Coleman Make Little to*
*No Progress towards Reunification*

56.     DCF provided Almond and Coleman with a Family Assessment and Action Plan ("FAAP"). The FAAP listed tasks for Almond and Coleman to complete in order to reunify with the children.

57.     The Action Plan required Almond and Coleman to engage in individual therapy to address long-standing substance use and mental health related concerns, submit to random drug tests, participate in family therapy with the triplets, and complete psychological evaluations and parenting classes.

58.     By April 2018, the DCF case management team found that Almond and Coleman made minimal, if any, progress toward reunifying based on a lack of consistent participation in services required by their Action Plan.

59.     In October 2018, the DCF case management team held a Foster Care Review meeting to discuss whether Almond and Coleman were making progress towards the goal of reunification.

60.     During this review, the facilitator determined that Almond and Coleman had not made sufficient progress on their Action Plan tasks and recommended that the children remain in the care and custody of DCF.

61.     In January 2019, DCF formally changed the children's permanency plan goal from reunification to adoption due to Almond and Coleman's continual lack of progress and indifference towards the goal of reunification.

62.     In April 2019, DCF held a Foster Care Review where they found that Almond and Coleman had made limited progress towards the tasks listed in their Action Plan and no progress toward others. However, DCF agreed that if Almond and Coleman participated in services for the

next four months, they would consider changing the children's permanency goal back to reunification.

### *Despite Almond Being Entirely Unfit to Care for the Triplets, DCF Moves to Reunify them with Almond and Coleman*

63.     On July 10, 2019, Juvenile Court heard the family's case and issued a finding that Mr. Almond was unfit to care for the triplets and additionally found that the triplets were still in need of care and protection.

64.     The Court's findings ended temporary custody by DCF and made DCF the boys' legal custodian.

65.     Despite the Court's decision the day prior, DCF convened a Permanency Planning Conference on July 11, 2019 and changed the triplets' permanency goal from adoption back to reunification.

66.     Just two days later, on July 12, 2019, DCF returned physical custody of A.A., the triplet's infant half-brother, to Almond and Coleman.

67.     At a Foster Care Review meeting in October 2019, the DCF case management team reported that Coleman and Almond were participating in their mandated home-based parenting support service and were visiting the triplets in their congregate care placement.

68.     The Foster Care Review panel recommended that Almond and Coleman could have a home visit by the triplets once they moved into a larger apartment.

69.     At the time, Almond and Coleman were still living in a one-bedroom apartment rented by Almond's mother.

70.     Living in this one-bedroom apartment were Almond, Coleman, Ann Shadburn (Mr. Almond's mother) and A.A.

71.     Shadburn had a long history with DCF, including having her own children removed from her care and termination of her parental rights.

72.     Shadburn has a significant criminal history including, but not limited to drug possession with intent to distribute, breaking and entering in daylight hours, and sexual conduct for a fee.

| Case Number | Case Type | File Date | Initiating Action |
|---|---|---|---|
| 1532SC000384 | Small Claims | 02/25/2015 | Small Claim $501-$2000 |
| 0032CR006013 | Criminal | 09/21/2000 | DRUG, POSSESS TO DISTRIB CLASS A c94C §32( |
| 0132CR001577 | Criminal | 04/23/2001 | DRUG, DISTRIBUTE CLASS A c94C §32(a) |
| 0432CR004039 | Criminal | 06/15/2004 | B&E BUILDING DAYTIME FOR FELONY c266 §18 |
| 0932CR005669 | Criminal | 09/17/2009 | CONSPIRACY TO VIOLATE DRUG LAW c94C §40 |
| 0932CR006213 | Criminal | 10/09/2009 | RECKLESS OPERATION OF MOTOR VEHICLE c9( |
| 9732CR000154 | Criminal | 01/09/1997 | SEXUAL CONDUCT FOR FEE c272 §53A |
| 9732CR000154 | Criminal | 01/09/1997 | NIGHTWALKER, COMMON c272 §53 |
| 9732CR002843 | Criminal | 05/23/1997 | SHOPLIFTING BY CONCEALING MDSE, 3RD OFF |
| 9932CR007427 | Criminal | 12/07/1999 | SHOPLIFTING BY CONCEALING MDSE c266 §30A |

73.     Coleman also had a significant violent criminal history stemming from 2011 including five counts of assault and battery with a dangerous weapon.

74.     On October 9, 2019, legal custody of A.A. was returned to Almond and Coleman to that one-bedroom apartment.

75.     The DCF FRAO received an update on December 18, 2019 that Almond and Coleman had been frequently canceling appointments and the provider was on the verge of recommending cancellation of the service due to Almond and Coleman's inconsistency and lack of engagement.

76.     Additionally, Almond and Coleman were frequently cancelling A.A.'s early intervention services.

77.     The parenting support service provider told the FRAO staff that they were concerned about Almond and Coleman's ability to meet the triplets' needs if they were sent home.

14

78.     Despite Almond and Coleman's regression and continued indifference, the DCF FRAO management continued to make the triplets' permanency goal to be reunification at the end of December 2019.

79.     This decision was made by DCF office management without any familiarity with the case and without conducting any administrative review of the case record.

80.     There was no consultation with any of the children's or family's current service providers before making the decision to reunify the triplets.

81.     Nevertheless, DCF set a reunification date for January 2020.

82.     The DCF case management team, congregate care provider and the triplet's collaborative school all independently requested a slower transition.

83.     Despite the Foster Care Review panel previously conditioning a home visit upon Almond and Coleman securing a larger apartment, DCF arranged a home visit for D.A., J.A. and M.A. at the one-bedroom apartment.

84.     When DCF brought the boys to Almond and Coleman's apartment on January 10, 2020 for a daytime visit, Coleman told the DCF worker that the reunification was moving too fast, that they were not ready, and that the apartment was too small.

85.     This explicit warning and request for help should have been a red flag for the DCF workers; it was not.

86.     Devereux School, where the triplets had been previously placed, also expressed concerns that the boys were still unready for reunification despite their immense progress in their program after their arrival in January 2018.

87.     Devereux requested and advocated for more time for the triplets to transition, stating the boys needed additional time to adjust to a new routine, soothe anxiety, and prevent problem behaviors.

88.     Throughout January 2020, DCF reported that Almond and Coleman cancelled further visits by the triplets, cancelled parent support appointments, and put in no work to get a larger apartment.

89.     DCF delayed reunification for one month to February 2020.

90.     Although Almond and Coleman displayed further regression in their Action Plan tasks and had not secured a larger apartment (or even begun searching for one), DCF brought the triplets to Almond and Coleman's overcrowded apartment for an overnight visit on February 7, 2020.

91.     During this overnight visit, Almond and Coleman reported that there was a physical altercation with J.A. in which Almond restrained him.

92.     J.A. pled with the Department not to return him to the apartment.

93.     Following this, Devereaux attempted again to request more time for the children to be able to transition due to their disabilities and their difficulties with coping with transitions.

94.     Devereaux also recommended that the children not transition home until they are able to engage in Applied Behavioral Analysis services, which would have been another provider in the home to monitor the family who was a mandated reporter.

95.     However, DCF only delayed reunification another month and did not ensure that services were in place prior to reunifying.

96.     J.A. remained in his congregate care placement and in DCF custody due to his own self-advocacy and his refusal to return to the care of Almond and Coleman.

97.     While DCF dismissed and pathologized his self-advocacy as a symptom of autism, J.A.'s self-advocacy saved him from starvation, abuse, and neglect, and likely saved his life.

98.     The week following the overnight visit, the triplets' congregate care providers at Devereaux sent a strongly worded letter to DCF opposing the decision to reunite the triplets with Almond and Coleman on the basis (i) that the physical environment of the home was inadequate to meet the children's therapeutic needs, (ii) that Almond and Coleman were facing eviction, and (iii) that the children needed a slower and more suitable transition plan.

99.     DCF held a discussion with the congregate care provider and the reunification date was delayed another month.

100.    On March 10, 2020, Governor Baker declared a state of emergency in response to the beginnings of the COVID-19 pandemic.

***DCF's Flagrantly Disregards Explicit Safety Warnings by Enacting an Expedited Reunification Process Which Thrust the Boys into a Dangerous, Abusive, and Neglectful Home Where Their Most Basic Needs Were Never Met and They Were Horrifically Tortured and Abused.***

101.    DCF placed D.A. and M.A. in the physical custody of Almond and Coleman on March 13, 2020.

102.    DCF retained legal custody of the two boys.

103.    D.A. and M.A. had been thriving in their congregate care placement and were in good health and at a healthy weight when they were handed over to Almond and Coleman.

104.    DCF turned custody of the two boys over to Almond and Coleman even though they still had not addressed the serious concerns regarding their living situation and were still in an overcrowded one-bedroom apartment with three adults and now three children.

105.    DCF turned custody of the D.A. and M.A. over to Almond and Coleman even with the knowledge that they were facing eviction and had expressed concerns about their ability to care for D.A. and M.A.

106.    DCF turned custody of the two boys over to Almond and Coleman despite not having adequate therapeutic home-based services in place for the boys.

107.    DCF turned custody of the two boys over to Almond and Coleman knowing that that the parenting support service was on the verge of terminating services with the family for non-participation.

108.    DCF turned custody of the two boys over to Almond and Coleman knowing that isolation due to the COVID epidemic could make the living situation even more dangerous.

109.    No DCF personnel is able to articulate any clear reason why D.A. and M.A. were reunified with Almond and Coleman.

110.    There were adequate funds in the Fall River Area Office's budget to continue the triplet's congregate care placement.

111.    Despite the high-risk factors and warning signs, the boys' case management team ceased doing in-person visits and changed to highly ineffective monthly virtual home visits.

112.    On March 20, 2020, DCF was notified that the family's in-home continuum service — a keystone of the family's amended transition plan to meet the boys' developmental and disability needs, the congregate care's concerns, and Coleman's concerns — would be going entirely remote.

113.    Soon after, the Fall River Public Schools and the parenting support service provider went remote as well.

18

114.    The avoidance of contact with providers and more so with the Department, should have heightened the Department's vigilance and should have triggered the need for an emergency, unannounced home visit to check on the safety and wellbeing of the children, who were still in their legal custody.

115.    Instead, the Department relied on virtual home visits from March to September 2020, limiting their ability to see and interact with the children and limiting their ability to view the conditions of the home.

116.    During this time, Coleman lied about the family's access to adequate and reliable technological service.

117.    No one from FRPS followed up to assure the boys had access to their education.

118.    Several of these concerns were either missed or disregarded by the Department and FRPS throughout the months the children were home resulting in tragic circumstances.

119.    Similarly, FRPS did not take any action to mitigate D.A.'s doubly destabilizing experience of transitioning to his father's apartment during a pandemic.

120.    Although FRPS conducted remote learning through the Spring of 2020, they had no engagement with D.A. or M.A.

121.    FRPS neither received work nor contact from the boys nor provided any services.

***DCF Approves Continuing Physical Custody of M.A and D.A. Despite Reports of Multiple Physical Injury, Apparent Control and Manipulation of the Boys by Coleman, and Reports of Increasing Distress.***

122.    In March 2020, Coleman reported to the continuum provider that D.A. was exhibiting "challenging behaviors". But in April 2020, she reported to the DCF case management team that there were no concerns regarding the children's behavior.

123.     Although the DCF case management team is mandated to collect and review reports from the children and family's other providers, DCF failed to respond appropriately.

124.     In mid-May 2020, the DCF case management team sought to conduct a virtual home visit.

125.     Coleman declined to have the visit citing technological issues and told the case management team that D.A. had vomited from having too many snacks and was lying in a pool of his own vomit.

126.     The DCF case management team failed to make any inquiry into this concerning report about D.A.'s health and well-being.

127.     Ten days later, when the DCF case management team did have a virtual home visit, Coleman controlled D.A. and M.A.'s communication with the DCF case management team by prompting them to provide specific answers to DCF's questions.

128.     DCF failed to intervene to ensure the boys were able to speak honestly and openly with them and to question or prevent Coleman from obstructing conversation and supervision.

129.     In May 2020, the family's parenting support provider terminated services for Coleman and Almond due to their refusal to participate in services.

130.     In June 2020, the continuum provider reported to the DCF case management team that Almond physically restrained D.A., that Coleman reported D.A. had displayed aggression, and that the family were requiring D.A. to scrub the floor with a toothbrush as one of his punishments.

131.     DCF, for the second time, ignored a report of a physical altercation within the home.

132.     During a second update in June 2020, the family's continuum provider reported to the DCF case management team that Coleman said she was fearful of being attacked by the boys and that D.A. was refusing to take his medication.

133.     However, she and Almond refused to contact the Mobile Crisis team per Department recommendation. Concerned, the service providers strongly suggested the need for the Department to conduct visits with the family in their home.

134.     According to the Department's Ongoing Casework and Documentation Policy, *"The schedule of contacts should include at least monthly visits by Social Worker with the child (ren), the child (ren)'s placement resource and the child (ren)'s parents."*

135.     The continuum provider urged the DCF case management team to see the family in-person.

136.     However, the DCF case management team did not pursue in-person visits when Coleman declined to meet outside of the home citing COVID-19 fears.

137.     During DCF's June 2020 virtual home visit, Coleman restated that D.A. had displayed "oppositional behaviors" but stated she did not feel overwhelmed.

138.     The DCF case management team failed to inquire into the physical altercation within the home, the reason for these "oppositional behaviors", or to appropriately check in with D.A. and M.A.

139.     During this June 2020 visit, when a DCF worker tried to ask D.A. and M.A. whether they had been brought to see J.A. at the congregate care setting, Coleman interrupted and prevented them from answering.

140.     The DCF worker asked again, and D.A. and M.A. said they wanted to see their triplet brother.

141.    The DCF case management team failed to appropriately address Coleman's obstruction of their assessment and supervision and further failed to provide appropriate accommodations and developmentally appropriate opportunities for communication in order to ensure that D.A. and M.A. could meaningfully participate in supervision.

142.    Social workers also failed to facilitate visits with all three brothers since J.A.'s displacement back in March 2020.

143.    On June 17, 2020, the Foster Care Review panel met and inexplicably found that Coleman and Almond were meeting D.A. and J.A.'s needs and that they were participating in continuum services.

144.    It was later concluded by the Office of Child Advocacy investigative team that it was not clear whether the panel had been appropriately updated about the parenting support service provider ceasing services with Almond and Coleman because they refused to participate or about the continuum provider's report that there was a physical altercation and significant conflict in the home.

145.    Between June and July 2020, Almond and Coleman failed to increase participation in continuum services and conflict and behavior challenges continued.

146.    On July 17, 2020, despite the fact that the DCF case management team had not appropriately conducted a visit to monitor the boys' well-being and had watched Coleman prevent them from speaking openly with the DCF workers, despite Almond and Coleman's refusal to participate in services, and despite reports of conflict in the home and physical altercations, the DCF FRAO office inappropriately recommended that the Juvenile Court should return legal custody of D.A. and M.A. to Almond.

147.    Almond didn't even appear for the hearing.

148.    They were also still living in a one-bedroom apartment, the insides of which hadn't been seen by DCF for months.

### *Increased Signs of Distress, Physical Injury and Sickness, and Limited Participation by Almond and Coleman Didn't Stop DCF From Returning Legal Custody of D.A. and M.A. to Almond.*

149.    The Juvenile Court returned legal custody of D.A. and M.A. to Almond and determined that the DCF Fall River Area Office should continue supervision of the family.

150.    That same day, on July 17, 2020, Coleman refused to allow DCF staff to meet with her, D.A., and M.A. outside of the home saying they had been exposed to Covid and further refused to have a virtual visit.

151.    The DCF case management team allowed Coleman to refuse the visit despite their duty to supervise the well-being of D.A. and M.A.

152.    On July 22, 2020, at the rescheduled home visit, the DCF case management team observed Coleman berate D.A. for behaviors she said he was "purposefully and defiantly exhibiting."

153.    DCF case management failed to make a developmentally appropriate intervention.

154.    Instead, DCF case management saw D.A. explain that he was embarrassed and upset and then shut down and stop talking.

155.    D.A.'s brother M.A. tried to advocate for his brother and provided further information to the DCF case management team that was contrary to Ms. Coleman's version of events.

156.    Coleman stated that M.A. was "making her look like a liar."

157.    Despite noting deception and verbal abuse by Coleman, conflict in the home, and two boys in their supervision expressing distress, the DCF case management team failed to appropriately intervene or conduct further inquiry and investigation.

158.    In August 2020, the continuum service provider alerted the DCF case management team that Coleman reported D.A. had scratched his collar bone until it had become raw.

159.    Despite knowing that this child under their supervision had sustained a physical injury which, if Coleman's version of events was true and it was self-inflicted, indicated that D.A. was experiencing significant distress, DCF case management failed to follow up with D.A. or anyone in the family about this injury.

160.    It is highly negligent for DCF to fail to follow up on a report of a physical injury sustained by a child under their supervision.

161.    Further, DCF failed to provide appropriate accommodations for D.A. by ignoring such a sign of distress from a young person diagnosed with autism spectrum disorder.

162.    According to The National Library of Medicine:

"Children with disabilities are at heightened risk for maltreatment, a significant public health problem referring to experiences of abuse (physical, sexual, or emotional) and/or neglect that are associated with deleterious outcomes across the lifespan"

"Children with ASD and abuse may show heightened behavioral difficulties, such as aggression, self-injury, tantrums, and fears, compared to children with ASD without abuse.

163.    Red flags continued to be raised and blatantly ignored by DCF and the FRPS.

164.    On August 21, 2020, the DCF FRAO received an anonymous abuse and neglect report warning that the conditions of the family's home were deplorable, that Coleman and Almond were engaging in dangerous substance abuse and that Shadburn has a significant criminal history.

165.    The DCF Fall River Office failed to accept this report for investigation.

166.    Instead, the case management team conducted an inadequate virtual home visit three days later.

167.    At the August 24, 2020 virtual home visit following the abuse and neglect report, the DCF case management team observed that D.A. had a bandage covering his nose.

168.    Coleman stated that D.A. had a self-inflicted injury and instructed D.A. on what to say to the DCF case management team.

169.    DCF failed to recognize this a "serious safety and welfare concern" and made no inquiry into the physical injury or D.A.'s distress.

170.    At this meeting, the DCF case management team's only inquiry into the abuse and neglect report was to ask Coleman whether the report had merit.

171.    Coleman made little of the report stating that they were having issues with a neighbor and the report had no merit.

172.    The DCF case management team failed to investigate this abuse and neglect report. They made no appropriate assessment of the substance abuse reports and accepted Coleman's self-reported sobriety as truth.

173.    The DCF case management team further failed to appropriately assess the conditions of the family's home.

174.    One of the initial concerns that DCF and other providers raised in the reunification process was the challenges that a one-bedroom apartment would pose to a family with three adults, an infant, and two adolescent boys with Autism. It was a significant failure that the team did not examine the home.

175.    On September 14, 2020, Coleman and Almond brought M.A. to the hospital in Rhode Island for an injury that she reported was, again, self-inflicted.

176.    The injury was serious enough that M.A. was admitted overnight for observation and discharged.

177.    The DCF case management team conducted their final virtual home visit on September 25, 2020.

178.    D.A. was on video and refused to speak. DCF failed to follow up with a boy who was in clear distress in a developmentally appropriate way.

179.    During this visit, Coleman further stated that D.A. was having behavioral issues and expressed concern about these behaviors.

180.    Despite the numerous reports that Coleman and others had made regarding behaviors which warranted additional inquiry and support, DCF failed to make appropriate follow-up.

181.    DCF knew between September 20 and October 3, that Almond and Coleman failed to attend any continuum appointments.

***Fall River Public Schools Utterly Fails D.A. and M.A.***

182.    Between March through October 2020, D.A. and M.A. were enrolled students with the Fall River Public School system.

183.    D.A. and M.A., as students with autism, had a substantive right to receive a free and appropriate public education ("FAPE") that complied with the requirements of federal and state law.

184.    As special education students enrolled in the Fall River Public Schools, the Fall River Public Schools owed D.A. and M.A. a non-discretionary duty to provide them with special education services required under federal and state law.

185.    Despite this clear, non-discretionary duty, the Fall River Public Schools, including their employees and agents, failed to provide the boys with the special education services to which they were entitled.

186.    Although Fall River Public Schools staff had contact with Coleman, school staff never saw or spoke with D.A. or M.A.

187.    Neither D.A. nor M.A. received any academic instruction or related special education service during the seven months in which they were enrolled in the Fall River Public School system.

188.    The failure to make any direct or virtual connection with D.A. and M.A. deprived these two autistic children of any ability or opportunity to engage with their teachers and support staff at school so that, at a bare minimum, those school employees would see what was very obviously there to be seen – two severely malnourished, abused, and neglected special needs children who had no ability to advocate for themselves.

189.    This choice of FRPS and its employees directly ensured that they, as the providers legally responsible for documenting the educational, social, and emotional growth of these boys in their school, would never be able to observe, document, and report the obvious changes that were occurring with the boys' physical, emotional, and educational well-being.

190.    Had FRPSand its employees complied with their obligations in providing special educational services for these boys, what they observed most certainly would have given the school and its employees reasonable cause to believe that each child was suffering from severe abuse and neglect.

191.    On October 1, 2020, a Fall River Public Schools Attendance Officer dropped off Chromebooks at the apartment.

192.    No other contact was ever made with the boys.

193.    A teacher with FRPS did, however, contact the DCF case management team on October 5, 2020 and again on October 14, 2020 and thereby notified DCF that D.A. and M.A. were not logging into school.

### *D.A.'s Excruciating Death Was Entirely Avoidable Had Defendants Done Their Jobs*



194.    Just seven days after a teacher contacted DCF, early in the morning of October 21, 2020, the Fall River Police Department received a 911 call concerning an unresponsive child located at 107 Green St.

195.    First responders arrived to find D.A. and M.A. emaciated, battered and abused, and severely neglected in a filthy, overcrowded one-bedroom apartment riddled with drug paraphernalia and hundreds of glassine baggies with traces of fentanyl and heroin.



196.    D.A. was unresponsive and wearing a diaper filled with his own waste.

197.    According to the Fall River Police Report, paramedics started CPR on D.A. while in the home but realized he was in grave condition.

198.    Paramedics thankfully decided M.A.  was "too malnourished to leave behind"[1] and was emergently taken in a separate ambulance to Charlton Memorial Hospital where his life was saved.



199.    Dr. Josheph Tondreau of Charlton Memorial Hospital pronounced D.A. deceased at 8:29 am on October 21, 2020.

200.    D.A. was just 14 years old.

---

[1] *See Fall River Police Report from 10.21.2020.*

201.   Dr. Katie Chapman informed officers that M.A. also appeared to be emaciated and suspected he had been severely neglected. When M.A. asked when he last time he ate was, Coleman answered for him.

202.   Massachusetts State Police Trooper Thomas Loughan of the MSP Crime Scene Service Section, photographed D.A. as he lay deceased in a hospital gurney:



203.   D.A. was in an adult size diaper that appeared to be saturated in fecal matter, indeed, D.A.'s body from his head to knees was also covered in his waste.

204.   D.A. had bruises on both hands, both feet, left ankle and both knees, and he had cuts on both ears and a scrape on his shoulder blade.

205.   D.A. was emaciated, appearing to weigh a total of 80 pounds.

206.    Charlton Memorial team as well as the officers contacted DCF and filed reports of the abuse and neglect of the children.

207.    Both Almond and Coleman were escorted to the Fall River Police Department to be interviewed, unfortunately it was too late for D.A.

208.    During Coleman's interview, officers learned that both M.A. and D.A. had tested positive for Fentanyl.

209.    Coleman and Almond were arrested.

210.    Coleman was charged with Neglect of a Disabled Person, Intimidation of a Witness, Assault and Batter on a Police Officer and Possession of a Class A Drug. Almond was charged with Abuse of a Disabled Person and Possession of a Class A Drug.

211.    M.A. was placed back into the custody of DCF.

212.    At the time of D.A.'s death in October 2020, after being with Amond and Coleman for just seven months, D.A. had lost sixty pounds and was well-below the average weight of a well-nourished fourteen-year-old child.

213.    The Office of the Medical Examiner ruled that D.A.'s cause of death was "Failure to Thrive and malnutrition due to starvation and neglect in an adolescent with autism spectrum disorder" and ruled his death a **homicide**.

### The Office of Child Advocate Investigation finds DCF and FRPS at Fault

214.    Shortly after the death of D.A., the Office of Child Advocate ("OCA") began an investigation into the individual and systemic failures that led to the abuse and neglect suffered by J.A., M.A. and D.A. and the resulting death of D.A.

215.    On March 31, 2021, the OCA published its findings with twenty-six recommendations for policy, procedure and practice improvements.

216.    The OCA investigation resulted in an over 100-page scathing investigative report ("OCA Report" or "Report") addressing the multiple failures, gross negligence, recklessness, and callous indifference of the Defendants.

217.    Indeed, the OCA found that D.A.'s tragic death, and the triplet brothers' abuse and injuries, were the result of failures at nearly every level by DCF and FRPS, stating in short:

> families who come to the attention of DCF bring complex problems and often multi-generational histories of trauma, poverty, and discrimination. The decisions made by and recommended to courts by child protective workers carry life-long consequences for the children and their families...Although neglect cases far outnumber cases of abuse, children can be seriously injured or die if their caretakers do not have the capacity to care for them. **The child protective system has many built-in safeguards, both internal and external to DCF. All of these safeguards failed [D.A.] and resulted in his untimely death**. (emphasis added).

> ***

> FRPS and their staff worked diligently to create effective plans for the district to provide remote and hybrid learning in the pandemic. It is this diligent work by the district that makes the experience of [D.A. and M.A.] particularly distressing from a systems analysis viewpoint because **these children fell through the safety net at every critical juncture**... **resulted in amplified risks** to D.A. that went unaddressed by FRPS. D.A. was never seen by, or spoken to by, any school employee from March 2020 to the time of his death in October 2020.

218.    A summary of other findings from the OCA include:

a.  D.A. died from child abuse and neglect.

b.  Children with disabilities are at least three times as likely to be maltreated than their peers without disabilities, and they are more likely to be seriously injured or harmed by abuse or neglect. The OCA has determined that D.A. and M.A.'s disabilities played a critical role in this situation, as their disabilities were intimately tied to their vulnerabilities.

c.  All entities working with the family failed to understand that Almond's and Coleman's active and persistent steps to keep D.A. and M.A. out of sight from DCF and the school officials was a purposeful effort intending to conceal the severe neglect and abuse that both children suffered.

d.  The DCF case management team did not re-examine the immediate post-reunification risks based on the family's avoidance of contact, the DCF

management team's inability to visit the home, and the immediate lack of in-person service provision.

e.  The DCF team did not observe the children, the home, or Almond or Coleman between June 19, 2020 and July 17, 2020.

f.  The DCF management team did not at any time seek to interview D.A. or M.A. outside the presence of Coleman.

g.  The FRPS never saw or spoke with D.A. or M.A. from March 16, 2020, when they were scheduled to begin school, to the time of D.A.'s death.

h.  DCF Fall River office failed to gather sufficient information prior to reunification.

i.  DCF Fall River office did not have cause to change the children's permanency goal from adoption back to reunification.

j.  DCF Fall River office failed adequately estimate Almond and Coleman's substance use.

k.  DCF Fall River office failed to evaluate Almond's capacity to be the educational decision maker for the boys.

l.  DCF's decision to screen out an August 21, 2020 report of neglect was a failure and a violation of the DCF Protective Intake Policy.

m.  DCF failed to address safety concerns with Shadburn.

n.  DCF Fall River failed to possess the basic knowledge and understanding of Autism Spectrum Disorder that significantly impacted their ability to make decision in the boys best interest.

o.  The reunification process started in December 2019 was not appropriate in light of the facts at their disposal.

p.  DCF area office "appeared willing to accommodate slight delays in the reunification plan but unwilling to fundamentally rethink the plan despite the serious concerns brough to their attention."

q.  DCF Fall River area office did not secure the recommended essential services for D.A. and M.A. thus they received zero individual services during the seven months while in the home.

r.  DCF failed to recognize the physical environment of the home did not meet the needs of the triplets.

s.  DCF failed to recognize D.A.'s clear physical and emotional deterioration between March 13, 2020 and his death.

t.  FRPS failed to pursue protective measures in light of multiple red flags as to the safety of D.A. and M.A.

u.  FRPS failed to visually observe either child while enrolled.

v.  FRPS failed to properly ensure mandated reporter responsibilities were being followed.

*Vicarious Liability Exists for All Front-Line Workers*

219.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

220.    The conduct and omissions detailed herein were committed by employees and/or agents of the DCF and FRPS Defendants.

221.    The Defendants and their employees and/or agents were acting within the scope of their employment or agency and under the color of state law.

222.    At all times relevant, the Defendants had the ability to control the conduct of the employees and/or agents in the course of their employment and/or agency.

223.    As such the Defendants are vicariously liable for the wrongful acts and omissions of their employees and/or agents that caused D.A., J.A. and M.A. discrimination, serious injury and death.

## COUNT I

*Wrongful Death of D.A. (Mass. Gen. Laws ch. 229, §2)*
*Personal Representative of the Estate of D.A. v. DCF Defendants*

224.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

225.    On or about August 2017, the DCF Defendants removed D.A. from his parent and assumed care and custody of D.A.

226.    DCF Defendants assumed the role of in loco parentis over D.A.

227.    DCF Defendants owed D.A. a duty of care at all times relevant.

228.    In or about March 2020, DCF reunified D.A. with his biological father and his girlfriend, despite repeated warnings, red flags and failures of the parents to engage in any pre-conditions that would support reunification.

229.    DCF Defendants breached their duty to D.A. to reasonably supervise, monitor and protect him.

230.    DCF Defendants had actual knowledge of a substantial risks of serious harm well prior to D.A.'s death.

231.    Notice of serious and heightened risks included, but are not limited to:

a.  Repeated removal of the boys from parental custody;

b.  Parental substance abuse;

c.  Failure of Coleman and Almond to engage in necessary parental services and conditions;

d.  Criminal history of adults living in the home with the boys;

e.  Prior DCF involvement with adults living in the home with the boys, including a history termination of parental rights;

f.  Repeated instances of physical injury with the boys;

g.  Pleading by J.A. to not return to the care of Almond and Coleman;

h.  Never investigating the inside of the residence;

i.  Failure of Almond and Coleman to move the boys into a larger home;

j.  Notifications from Coleman that they were not ready for reunification;

k.  Failure of Almond and Coleman to appear for Court hearings;

l.  Repeated anonymous reports of neglect, drug use and abuse; and

m.  Repeated concerns raised by Devereux school.

232.    Despite all of the red-flags, DCF placed D.A. within the care of Almond and Coleman.

233.    DCF Defendants failed to exercise due care and violated multiple affirmative duties under state and federal law and policy, including but not limited to:

a.  The duty to reasonably supervise, monitor, and communicate with the triplet brothers;

b.  The duty to recognize and respond appropriately to a multitude of clear signs of abuse and neglect;

c.  The duty to reasonably perform clinical formulation, assessment, case planning, make reasonable case decisions, and ensure effective provision of services;

    d.   The duty to facilitate reasonable transition;

    e.   The duty to identify and locate kin, to prioritize kinship placement and to provide notice of removal to kin;

    f.   The duty to provide the boys with notice of their rights before service reduction and termination;

    g.   The duty to ensure access to healthcare; and

    h.   Additional negligence, gross negligence, and recklessness.

234.    DCF Defendants failed to exercise due care and violated multiple affirmative duties including but not limited to:

    a.   Monthly supervision requirements under 42 U.S.C. § 624 (f)(1)(A);

    b.   Providing reasonable communication accommodations and assistance in violation of 29 U.S.C. 794; CFR 35; the Americans with Disabilities Act of 1990; and 110 CMR 1.08-1.09;

    c.   Maintaining meaningful contact with the children pursuant to 110 CMR 1.02; and

    d.   Assuring the boys that they were entitled to the care and protection of DCF while under their legal custody and supervision.

235.    As a proximate result of DCF Defendants' failures detailed herein, DCF by and through its employees removed D.A. from the relative safety of his placement at a residential treatment center and placed him into an actual house of horrors where he was severely abused and neglected, starved, drugged, deprived of access to other potential intervenors, deprived of access to and connection with kin, deprived of the therapy and medical care necessary for treatment and management of his disabilities, deprived of an adequate education, and otherwise left with completely inadequate care and supervision as a child with a disability.

236.    DCF Defendants' affirmative acts and omissions constitute gross and wanton conduct.

237.    DCF Defendants' gross and wanton negligence caused D.A.'s severe pain and suffering and death which was a reasonably foreseeable result of DCF Defendants' failure to perform their duties.

## COUNT II

### *Negligence*
### *J.A. and M.A. v. DCF Defendants*

238.    The Plaintiff repeats and realleges here all prior paragraphs of this Complaint.

239.    On or about August 2017, the DCF Defendants removed J.A. and M.A. from their parent and assumed care and custody of them.

240.    DCF Defendants assumed the role of in loco parentis over J.A. and M.A.

241.    DCF Defendants owed J.A. and M.A. a duty of care at all times relevant.

242.    DCF Defendants, as the children's legal custodian and supervisor, has the duty to protect children entrusted to its care from foreseeable risks of harm, including harm which would likely result if they were placed into a previously abusive home where there was insufficient and ineffective mitigation of risk to the children of which DCF Defendants had knowledge.

243.    In or about March 2020, DCF reunified D.A., J.A. and M.A. with their biological father and his girlfriend, despite repeated warnings, red flags and failures of the parents to engage in any pre-conditions that would support reunification.

244.    DCF Defendants breached their duty to J.A. and M.A. to reasonably supervise, monitor and protect them.

245.    DCF defendants had actual knowledge of a substantial risks of serious harm well prior to D.A.'s death.

246.    Notice of serious and heightened risks included, but are not limited to:

   a.  Repeated removal of the boys from parental custody;

   b.  Parental substance abuse;

   c.  Failure of Coleman and Almond to engage in necessary parental services and conditions;

   d.  Criminal history of adults living in the home with the boys;

e.   Prior DCF involvement with adults living in the home with the boys, including a history termination of parental rights;

f.   Repeated instances of physical injury with the boys;

g.   Pleading by J.A. to not return to the care of Almond and Coleman;

h.   Never investigating the inside of the residence;

i.   Failure of Almond and Coleman to move the boys into a larger home;

j.   Notifications from Coleman that they were not ready for reunification;

k.   Failure of Almond and Coleman to appear for Court hearings;

l.   Repeated anonymous reports of neglect, drug use and abuse; and

m.   Repeated concerns raised by Devereux school.

247.   Despite all of the red-flags, DCF placed D.A., J.A. and M.A. within the care of Almond and Coleman.

248.   DCF Defendants failed to exercise due care and violated multiple affirmative duties under state and federal law and policy, including but not limited to:

a.   The duty to reasonably supervise, monitor, and communicate with the brothers

b.   The duty to recognize and respond appropriately to a multitude of clear signs of abuse and neglect;

c.   The duty to reasonably perform clinical formulation, assessment, case planning, make reasonable case decisions, and ensure effective provision of services,

d.   The duty to facilitate reasonable transition;

e.   The duty to identify and locate kin, to prioritize kinship placement and to provide notice of removal to kin;

f.   The duty to provide the boys with notice of their rights before service reduction and termination;

g.   The duty to ensure access to healthcare; and

h.   Additional negligence, gross negligence, and recklessness.

249.   As a proximate result of DCF Defendants' failures detailed herein, DCF by and through its employees removed D.A., J.A. and M.A. from the relative safety of their placement at a residential treatment center and placed them into an actual house of horrors where D.A. and M.A.

were severely abused and neglected, starved, drugged, deprived of access to other potential intervenors, deprived of access to and connection with kin, deprived of the therapy and medical care necessary for treatment and management of their disabilities, deprived of an adequate education, and otherwise left with completely inadequate care and supervision as children with disabilities.

250.    DCF Defendants' gross wanton negligence caused J.A.'s and especially M.A.'s torture, abuse, and neglect which was a reasonably foreseeable result of DCF Defendants' failure to perform their duties.

## COUNT III

### *Negligent and Reckless Infliction of Emotional Distress to M.A. and J.A. v. all Defendants*

251.    The Plaintiff repeats and realleges here all prior paragraphs of this Complaint.

252.    Defendants all had a duty to M.A. and J.A. to take reasonable steps to avoid causing undue emotional distress.

253.    Defendants breached this duty by negligently and/or recklessly intervening in the boys' lives, repeatedly placing them in a wholly unfit and abusive home; making sham efforts to protect and supervise the boys while they starved and wasted away; failing to recognize neglect and abuse; and failing to assure students were participating in education, among other negligent and/or reckless acts.

254.    J.A. experienced such extreme emotional distress from DCF Defendants' negligent and/or reckless placement in an unfit, improper, and abusive home that he experienced a behavior escalation and physical altercation.

255.    J.A. was withheld from his identical triplet siblings.

256.    M.A. and D.A. were forced to transition too quickly and without adequate support and protection to live in an unfit home with abusers where they were starved and later found emaciated and with fentanyl in their systems.

257.    J.A. and M.A. were caused to witness the abuse and neglect of their brothers which caused significant distress and emotional injury, all as a result of the acts and omissions of the Defendants.

258.    M.A. was caused to witness the death of his brother D.A. at the hands of his supposed care givers, his father and his girlfriend.

259.    J.A. and M.A. suffered significant damage as a result of the Defendants' acts and omissions.

260.    J.A. and M.A.'s resulting emotional distress was so severe and debilitating that it manifested in physical symptoms.

## <u>COUNT IV</u>

### *Title II of the Americans with Disabilities Act of 1990*
### *J.A., M.A., D.A. v. DCF and Commonwealth Defendants*

261.    The Plaintiff repeats and realleges here all prior paragraphs of this Complaint.

262.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a)[[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs]; *see also* 34 C.F.R. §104.4(a)[Office of Civil Rights; Department of Education; Nondiscrimination on the basis of Handicap in programs or activities receiving federal financial assistance].

263.    An "individual with a disability" is defined by reference to the Americans with Disabilities Act ("ADA") as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." A "qualified individual with a disability" is one who, with or without reasonable accommodation for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance.

264.    D.A., J.A. and M.A. each qualify as "individual[s] with a disability" as defined by reference to the Americans with Disabilities Act ("ADA"). The ADA defines a child with a disability as "a child with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services."

265.    D.A., J.A., and M.A. were/are qualified individuals with disabilities.

266.    DCF is a public entity under the definition of 42 U.S.C. §12132.

267.    DCF failed to provide meaningful access to DCF services by not implementing accommodations for D.A., M.A., and J.A.'s disabilities.

268.    D.A., M.A., and J.A. were excluded from participation and denied the benefits and services of DCF or otherwise discriminated against to include, but not limited to the following:

   a.  Deprived of permanency planning;
   b.  family-based placements;
   c.  transition and reunification services;
   d.  supervision and welfare investigation services;
   e.  accommodations due to disability;

      f.   safety; and

      g.   adequate communication.

269.    DCF's exclusion and discrimination was due to D.A., J.A., and M.A.'s disability.

270.    Due to DCF's exclusion and discrimination, D.A., J.A., and M.A. were caused to suffer extreme harm, including death, due to the Defendants' failures.

**COUNT V**

***Title II of the Americans with Disabilities Act of 1990***
***M.A., D.A. v. FRPS and Commonwealth Defendants***

271.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a)[[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs]; *see also* 34 C.F.R. §104.4(a)[Office of Civil Rights; Department of Education; Nondiscrimination on the basis of Handicap in programs or activities receiving federal financial assistance].

272.    FRPS is a recipient of federal financial assistance, including federal financial assistance provided to the district's schools and special education and Section 504 programs.

273.    A "program or activity" includes local education agencies, public boards of education, and school systems.[2] FRPS is a "program or activity."[3]

---

[2] 29 U.S.C. §794(b)(2)(B)[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs], referencing 20 U.S.C. §7801(26)[strengthening and improvement of elementary and secondary schools]. A "recipient of federal financial assistance" is a public or private agency or other entity to which Federal financial assistance is extended directly or through another recipient. 34 C.F.R. §104.3(f) [Office of Civil Rights; Department of Education; Nondiscrimination on the basis of Handicap in programs or activities receiving federal financial assistance].

[3] *See* 29 U.S.C. § 794(b)(2)(B)[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs], referencing 20 U.S.C. §7801(26)[strengthening and improvement of elementary and secondary schools].

274.    FRPS is an entity subject to the non-discrimination requirements of Section 504.

275.    Section 504 requires recipients of federal funding to:

    a.  Provide an appropriate education to all qualified handicapped persons who are in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

    b.  Not discriminate against a qualified individual;

    c.  Provide equal opportunity to qualified persons with disabilities to participate in or benefit from any aid, benefit, or service they make available; and

    d.  Establish and maintain procedures to ensure that children with disabilities and their custodians are guaranteed procedural safeguards with respect to the provision of FAPE.

276.    An "individual with a disability" is defined by reference to the Americans with Disabilities Act ("ADA") as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." A "qualified individual with a disability" is one who, with or without reasonable accommodation for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance.

277.    D.A. and M.A. each qualify as "individual[s] with a disability" as defined by reference to the Americans with Disabilities Act ("ADA"). The ADA defines a child with a disability as "a child with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services."

278.    D.A. is regarded as a child with disabilities based on developmental impairments. D.A. has autism spectrum disorder that would qualify him as meeting the definition of disability.

279.     M.A. is regarded as a child with disabilities based on developmental impairments. M.A. has autism spectrum disorder that would qualify him as meeting the definition of disability.

280.     D.A. and M.A. were enrolled in FRPS from March 17, 2020 until the time of D.A.'s death on October 21, 2020.

281.     FRPS and its employees' refusal to provide appropriate communication options to D.A. and M.A. discriminated against D.A. and M.A. as people with disabilities who required accommodations, denied them a free appropriate public education as compared to their non-disabled peers.

282.     FRPS and its employees' refusal to provide appropriate communication options to D.A. and M.A. was illegal disability-based discrimination that violated Section 504 of Rehabilitation Act of 1973.

283.     FRPS and its employees' discrimination was intentional as FRPS and its employees knowingly failed to engage D.A. and M.A. between March 2020 and October 2020.

284.     Defendant FRPS was on notice of D.A. and M.A.'s need for special education services. Therefore, FRPS had knowledge of D.A. and M.A.'s disabilities and failed to act on that knowledge in direct violation of Section 504 of the Rehabilitation Act of 1973.

285.     Instead of evaluating D.A. and M.A., attempting to understand the manifestations of their respective disabilities, and providing them with reasonable accommodations for purposes of accessing their education, the defendants intentionally chose to ignore and discriminate against D.A. and M.A. because to do otherwise would require a significant amount of resources and attention.

286.    As a direct and proximate result of Defendants' conscious disregard and discrimination, D.A and M.A were excluded from participation in and denied the benefits of FRPS programming and a free appropriate public education.

287.    Defendant acted with deliberate indifference when they failed to have any contact with D.A. and M.A. or deliver any of the accommodations in accordance with Section 504 procedures, even though they were on notice that both D.A. and M.A. were qualified individuals with a disability.

288.    As a direct and proximate result of D.A. and M.A.'s deprivation of special education services, D.A. and M.A. suffered physical manifestations of their psychological injuries, severe emotional distress, and mental anguish and injury to their educational process.

289.    As the proximate cause of these violations of Section 504, D.A. and M.A. suffered harm as set forth above.

## COUNT VI

### *Violation of 42 U.S.C. §1983 Deprivation of Rights*
### *D.A., J.A. and M.A. v. all Defendants*

290.    The Plaintiff repeats and realleges here all prior paragraphs of this Complaint.

291.    All Defendants were acting under the color of state law, namely the Commonwealth of Massachusetts.

292.    Defendants' failures as detailed herein, deprived D.A., J.A. and M.A. of their rights to due process and equal protection guaranteed by the Fourteenth Amendment to the Constitution.

293.    These substantive due process rights include, but are not limited to:

    a.  The right to protection from unnecessary harm while in government custody;

    b.  The right to a living environment that protects foster children's physical, mental, and emotional safety and well-being;

    c.   The right to services necessary to prevent foster children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure placements, appropriate monitoring and supervision, appropriate planning and services directed towards ensuring that the child can leave foster care and grow up in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services;

    d.   The right to treatment and care consistent with the purpose and assumption of custody by DCF;

    e.   The right to receive care, treatment, and services determined and provided through the exercise of accepted professional judgment.

294.    Defendants' failures as detailed herein, deprived D.A., J.A. and M.A. of their rights to life, liberty and the pursuit of happiness as well as education.

295.    As a direct and proximate result of the actions of these Defendants, the Plaintiffs have suffered extreme harm including death, severe malnutrition and physical injury, severe and permanent mental distress and emotional harm as well as other consequential damages.

## COUNT VII

### *Negligence and Gross Negligence*
### *D.A. and M.A. v. FRPS Defendants*

296.    The Plaintiff repeats and realleges here all prior paragraphs of this Complaint.

297.    FRPS Defendants breached their duty to D.A. and M.A. to reasonably supervise, monitor and protect them.

298.    FRPS and its employees and/or agents completely failed to engage, interact with, and communicate with D.A. or M.A. for over seven months.

299.    FRPS Defendants had actual knowledge of a substantial risk of serious harm.

300.    FRPS Defendants failed to exercise due care and violated multiple affirmative duties under state and federal law and policy, including but not limited to:

    a.   The duty to provide a "free appropriate public education" to children with disabilities as required by Section 504 of the Americans with Disabilities Act

(ADA), the Individuals with Disabilities Education Act (IDEA), and the Massachusetts Special Education Statute, M.G.L. c. 71B, §1, et seq.;

b. The duty to supervise and train; and

c. The duty to fulfill a mandatory reporting obligation pursuant to M.G.L. c. 119, §51A.

301.   The failures to engage with students enrolled in their educational program and failure to report educational neglect breached the school's express duty to document each child's "growth in the acquisition of knowledge and skills, including social/emotional development" as required by law.

302.   The failure to make any direct or virtual connection with D.A. and M.A. deprived these two autistic children of any ability or opportunity to engage with their teachers and support staff so that, at a bare minimum, these school employees would see what was very obviously there to be seen – two severely malnourished, abused, and neglected special needs children who had no ability to advocate for themselves.

303.   These failures caused serious injury to D.A. and M.A.

**WHEREFORE, Plaintiff respectfully requests the following relief:**

A. An order impounding all pleadings and documents filed with the Court revealing D.A., J.A., and M.A.'s identities or actual names;

B. An award to the Plaintiff of damages in an amount sufficient to compensate them for their injuries, including, but not limited to, past, present, and future physical and psychological injuries, pain and suffering, past, present, and future emotional distress, impaired earning capacity, past, present, and future medical expenses, loss of income, and other damages;

C. An award to the Plaintiffs of punitive or exemplary damages as permitted by law;

D. An award to the Plaintiffs of their attorneys' fees, costs, and interest as permitted by law;

E. Such further and other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

THE PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

Respectfully Submitted,

Steve Hanna, Personal Representative of the Estate of D.A., and Conservator for J.A. and M.A.

Plaintiffs,

By their attorneys,

Paula S. Bliss, Esq., BBO#652361
Kimberly Dougherty, Esq., BBO# 658014
Martha Carol, Esq., BBO# 710818
Justice Law Collaborative, LLC
210 Washington St.
North Easton, MA 02356
paula@justicelc.com
kim@justicelc.com
martha@justicelc.com

And

Heather M. Bonnet-Hébert, Esq. BBO#660534
Feingold Bonnet-Hébert, P.C.
700 Pleasant Street, Ste 520
New Bedford, MA 02740
heather@rbflaw.net

Dated: October 11, 2023