UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN J. HANNA as SPECIAL PERSONAL REPRESENTATIVE OF THE ESTATE OF MINOR D.A. and CONSERVATOR FOR MINOR SIBLINGS M.A. and J.A., IN THEIR INDIVIDUAL CAPACITY AND AS HEIRS OF D.A.'s ESTATE, <br><br> Plaintiff, <br><br> v. <br><br> DEPARTMENT OF CHILDREN AND FAMILIES, DCF SOCIAL WORKER CONEICAO PEREIRA; DCF SOCIAL WORKER JANE OR JOHN DOE, DCF ONGOING SUPERVISOR JANE OR JOHN DOE, DCF FALL RIVER AREA OFFICE PROGRAM MANAGER JANE OR JOHN DOE, DCF AREA CLINICAL MANAGER JANE OR JOHN DOE, DCF FALL RIVER AREA OFFICE AREA DIRECTOR JANE OR JOHN DOE, DCF FOSTER CARE REVIEW UNIT JANE AND JOHN DOE, UNKNOWN DOES, GOVERNOR MAURA HEALEY, SECRETARY OF HEALTH AND HUMAN SERVICES KATE WALSH, ACTING COMMISSIONER OF DCF STAVERNE MILLER, FALL RIVER SCHOOLS SUPERINTENDANT MARIA PONTES, and FALL RIVER PUBLIC SCHOOL SYSTEM, <br><br> Defendants. | C.A. No. 1:23-cv-12340-ADB |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

    Plaintiff Stephen J. Hanna ("Plaintiff"), in his role as Personal Representative and Conservator, brought this action on behalf of three minor triplet brothers, J.A., M.A., and D.A., after child abuse and neglect committed by the triplets' biological father and his then live-in girlfriend caused the tragic death of D.A. and injuries to J.A. and M.A.  Plaintiff brought the

action against the Department of Children and Families ("DCF"), as well as Governor Maura

Healey, Secretary of Health and Human Services Kate Walsh, and Acting Commissioner of DCF

Staverene Miller[1] in their official capacities, (the "Commonwealth Defendants"), and against

Fall River Public Schools,[2] ("FRPS" and, collectively with the Commonwealth Defendants,

"Defendants").[3]  In the Amended Complaint, [ECF No. 6 ("Amended Complaint" or "Am.

Compl.")], against the Commonwealth Defendants, Plaintiff asserts negligence-based claims

(Counts I, II, and III), claims under Title II of the Americans with Disabilities Act ("ADA") and

§ 504 the Rehabilitation Act (Count IV[4]), and § 1983 claims (Counts VI and VII).  Against

FRPS, Plaintiff brings claims under the ADA and Rehabilitation Act (Count V) and under two

theories of negligence (Counts III and VIII[5]).  Currently before the Court are motions to dismiss

by both the Commonwealth Defendants, [ECF No. 29], and FRPS, [ECF No. 36].  For the

---

[1] On September 22, 2023, Staverene Miller replaced Linda Spears as Acting Commissioner of DCF.  Pursuant to Federal Rule of Civil Procedure 25(d), Miller in her official capacity is substituted as a Defendant in place of Spears.

[2] Because FRPS Superintendent Maria Pontes, who is also named as a defendant, is only being sued in her official capacity, the claims against her will be treated as claims against the FRPS. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

[3] Plaintiff also brought claims against a DCF social worker, Coneicao Pereira.  [Am. Compl. ¶ 13].  She moved to dismiss on July 15, 2024, [ECF No. 31], and Plaintiff agreed to dismiss the claims against her.  [ECF No. 44].

[4] Although Counts IV and V are asserted nominally against both Defendant FRPS and the Commonwealth Defendants, the allegations in Count IV only concern the Commonwealth Defendants, and the allegations in Count V only concern FRPS.  See generally [Am. Compl. ¶¶ 271–89].  As such, the Court construes Count IV as having been brought against the Commonwealth Defendants and Count V as having been brought against FRPS.

[5] The Amended Complaint lists two separate claims as "Count VII."  See [Am. Compl. ¶¶ 315–20 (§ 1983 claim), 321–28 (negligence)].  The Court construes the § 1983 claim against the Commonwealth Defendants as Count VII and the negligence claim against FRPS as Count VIII.

reasons articulated herein, FRPS's motion to dismiss is **GRANTED**, and the Commonwealth

Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

The following facts are taken from the Amended Complaint, the factual allegations of

which are assumed to be true when considering a motion to dismiss.  See Ruivo v. Wells Fargo

Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).  As it may on a motion to dismiss, the Court has

also considered "documents incorporated by reference in [the complaint], matters of public

record, and other matters susceptible to judicial notice."  Giragosian v. Ryan, 547 F.3d 59, 65

(1st Cir. 2008) (alteration in original) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12,

20 (1st Cir. 2003)).

### A.   Factual Background

Triplets D.A., M.A., and J.A. were born in February 2006 in Syracuse, New York.  [Am.

Compl.  ¶ 27].  At age two, they were diagnosed with autism spectrum disorder.  [Id. ¶ 28].

Soon after their birth, the New York Office of Child and Family Services ("NYOCFS") removed

the boys from their parents' custody and placed them with their maternal grandparents for a short

period of time before reunifying them with their parents.  [Id. ¶ 29].  Over the next seven years,

the triplets were removed from their parents' custody by NYOCFS three times.  [Id. ¶ 30].  The

removals stemmed from their parents' "substance abuse, deplorable living conditions, medical

neglect, inability to provide adequate supervision, and lack of basic care."  [Id. ¶ 31].

Their father, John Almond ("Almond"), moved to Massachusetts in 2013 and had very

limited contact with his sons, who remained in NYOCFS custody.  [Am. Compl. ¶ 33].

NYOCFS made several unsuccessful attempts to reunify the children with their mother,

ultimately removing them from her care for the last time in 2016.  [Id. ¶¶ 34–37].  Around the

same time, Almond resurfaced and began visiting with the children and attending court hearings. [Id. ¶ 38].  In September 2016, a New York court awarded Almond full custody of the boys, and their grandparents helped transport the children to join Almond in Fall River, Massachusetts. [Id. ¶ 40].

In June 2017, the Massachusetts Department of Children and Families ("DCF") received a report stating that Almond and his girlfriend, Jaclyn Coleman ("Coleman"), were abusing substances, neglecting to provide the children with medical care, failing to ensure that they attended school, and keeping unsanitary conditions in the home.  [Am. Compl. ¶ 46].  In August 2017, the DCF Fall River Area Office ("FRAO") opened a child protection case to monitor the family.  [Id. ¶ 47].  In October 2017, the triplets were removed from the home due to allegations of neglect and physical abuse, parental substance abuse, unsanitary conditions in the home, medical neglect, and the triplets' excessive absences from school.  [Id. ¶ 48].  Following this removal, the triplets were placed at the Devereux School ("Devereux"), a congregate care placement for individuals with intellectual disabilities and autism spectrum disorder.  [Id. ¶ 51].

DCF provided Almond and Coleman with a Family Assessment and Action Plan ("FAAP").  [Am. Compl. ¶ 55].  The FAAP listed tasks for Almond and Coleman to complete to reunify with the children, including attending individual therapy to address long-standing substance abuse and mental health concerns, submitting to random drug testing, participating in family therapy with the triplets, and completing psychological evaluations and parenting classes. [Id. ¶¶ 55–56].  By April 2018, the DCF case management team found that Almond and Coleman had made minimal, if any, progress toward reunifying based on a lack of consistent participation in services required by their FAAP.   [Id. ¶ 57].  In October 2018, the DCF team held a Foster Care Review meeting to discuss whether Almond and Coleman had made progress,

and the facilitator determined that they had not, ultimately recommending that the children remain in the care of DCF. [Id. ¶¶ 58–59]. In January 2019, DCF formally changed the children's permanency plan goal from reunification to adoption because of Almond and Coleman's continual lack of progress and indifference toward reunification. [Id. ¶ 60].

In April 2019, DCF held another Foster Care Review, where they again found that Almond and Coleman had made limited progress towards the tasks listed in their FAAP and no progress towards others. [Am. Compl. ¶ 61]. DCF agreed, however, to consider changing the children's permanency goal back to reunification if Almond and Coleman participated in services for the next four months. [Id.].

On July 10, 2019, the Juvenile Court heard the family's case and issued a finding that Almond was unfit to care for the triplets, thereby making DCF the boys' legal custodian. [Am. Compl. ¶¶ 62–63]. Despite that decision, the very next day, July 11, 2019, DCF changed the triplets' permanency goal from adoption back to reunification. [Id. ¶ 64].

At a Foster Care Review meeting in October 2019, the DCF case management team reported that Coleman and Almond were participating in their mandated home-based parenting support service program and were visiting the triplets in their congregate care placement. [Am. Compl. ¶ 66]. DCF recommended that Almond and Coleman be allowed to have a home visit with the triplets once they moved into an apartment larger than the one-bedroom apartment where they resided at the time. [Id. ¶¶ 67–69].

On December 18, 2019, DCF FRAO received an update that Almond and Coleman had been frequently cancelling appointments, and that their provider was on the verge of recommending cancellation of the service due to their inconsistency and lack of engagement. [Am. Compl. ¶ 74]. The parenting support service provider told the DCF FRAO staff that they

were concerned about Almond and Coleman's ability to meet the triplets' needs if they were sent home.  [Id. ¶ 76].  Despite this update, DCF FRAO management continued to pursue reunification as the triplets' permanency goal.  [Id. ¶ 77].

DCF set a reunification date for January 2020, despite having no familiarity with the case, and without having conducted any administrative review of the case record, or consulting with any of the children's or family's service providers.  [Am. Compl. ¶¶ 78–80].  The DCF case management team, congregate care provider, and the triplet's collaborative school all urged DCF to slow the transition.  [Id. ¶ 81].  When DCF brought the boys to Almond and Coleman's one-bedroom apartment on January 10, 2020 for a home visit (despite previously conditioning a home visit on Almond and Coleman moving to a larger apartment), Coleman told the DCF worker that the reunification was moving too fast, they were not ready, and the apartment was too small.  [Id. ¶¶ 83–84].

Throughout January 2020, DCF reported that Almond and Coleman cancelled further visits with the triplets, cancelled parent support appointments, and put in no work to get a larger apartment.  [Am. Compl. ¶ 88].  DCF delayed reunification to February 2020.  [Id. ¶ 89].

On February 7, 2020, DCF brought the triplets to Almond and Coleman's apartment for an overnight visit, during which Almond and Coleman reported that there was a physical altercation with J.A. in which Almond restrained him.  [Am. Compl. ¶¶ 90–91].  J.A. pled with DCF not to return him to the apartment, and he ultimately "refused" to return, subsequently remaining at Devereux at all times relevant to this action.  [Id. ¶¶ 92, 96].  Following the visit, Devereaux requested more time for the children to transition and sent a strongly worded letter to DCF opposing the decision to reunite the triplets with Almond and Coleman on the basis that (i) the physical environment of the home was inadequate to meet the children's therapeutic needs,

(ii) Almond and Coleman were facing eviction, and (iii) the children needed a transition plan that appropriately accommodated their disabilities and provided for a safe transition.  [Id. ¶¶ 93, 99]. Devereaux also recommended that the children be able to engage in "Applied Behavioral Analysis" services, which would have been another provider in the home to monitor the family. [Id. ¶ 94].  DCF delayed reunification another month but did not ensure that Applied Behavioral Analysis services were in place, or that the family had moved into a larger apartment.  [Id. ¶¶ 95, 100].

On March 12, 2020, Governor Baker declared a state of emergency in response to the beginnings of the COVID-19 pandemic.  [Am. Compl. ¶ 101].  Three days later, DCF placed D.A. and M.A. in the physical custody of Almond and Coleman, although DCF retained legal custody.  [Id. ¶¶ 102–03].  D.A. and M.A. had been doing well in their congregate care placement and were in good health and at a healthy weight when they were placed with Almond and Coleman.  [Id. ¶ 104].  DCF placed the two boys in Almond and Coleman's physical custody even though the couple (i) had still not addressed serious concerns regarding their living situation, (ii) was facing eviction, (iii) had expressed concerns about their ability to care for D.A. and M.A., and (iv) did not have adequate therapeutic home-based services or accommodations in place for the boys.  [Id. ¶¶ 105–07].  There were adequate funds in the FRAO budget to continue the triplet's congregate care placement, and it remains unclear why DCF decided to reunify D.A. and M.A. with Almond and Coleman.  [Id. ¶¶ 110–11].

After placing the boys with Almond and Coleman, the boys' case management team ceased doing in-person visits and changed to monthly virtual home visits from March to September 2020.  [Am. Compl. ¶¶ 112, 116].  On March 20, 2020, DCF was notified that the family's in-home continuum service — the intensive in-home service the amended transition

plan offered in the absence of more specialized developmental and disability services — would be going entirely remote.  [Id. ¶ 113].  Soon after, FRPS and the parenting support service provider went remote as well.  [Id. ¶ 114].

In March 2020, Coleman reported to the continuum provider that D.A. was exhibiting "challenging behaviors," but then in April reported to the DCF case management team that there were no concerns regarding the children's behavior.  [Am. Compl. ¶ 123].  In mid-May 2020, the DCF case management team sought to conduct a virtual home visit.  [Id. ¶ 125].  Coleman declined, citing technological issues, and she told the case management team that D.A. had vomited from having too many snacks and was lying in a pool of his own vomit.  [Id. ¶ 126]. The DCF management team did not make any inquiry into this report about D.A.'s health.  [Id. ¶ 127].  Ten days later, DCF did conduct a virtual home visit, during which Coleman controlled D.A. and M.A.'s communication with the DCF team by prompting them to provide specific answers to DCF's questions.  [Id. ¶ 128].  DCF did not intervene.  [Id. ¶ 129].

In May 2020, the family's parenting support terminated services because of Almond and Coleman's failure to participate.  [Am. Compl. ¶ 131].  In June 2020, the continuum provider reported to DCF that Almond had physically restrained D.A., that Coleman reported that D.A. had displayed aggression, and that the family was requiring D.A. to scrub the floor with a toothbrush as punishment.  [Id. ¶ 132].  In a subsequent update in June 2020, the continuum provider reported that Coleman said she was fearful of being attacked by the boys and that D.A. was refusing to take his medication.  [Id. ¶ 135].  The couple refused, however, to contact the Mobile Crisis line suggested by the continuum provider.  [Id. ¶ 136].  Concerned, the service

providers strongly suggested the need for DCF to conduct home visits.  [Id.].[6]  Nonetheless, DCF

did not pursue in person visits once Coleman declined to meet outside the home citing COVID-

19 fears.  [Id. ¶ 139].

DCF did conduct a virtual home visit in June 2020, during which Coleman restated that

D.A. had displayed "oppositional behaviors," but that she did not feel overwhelmed.  [Am.

Compl. ¶ 140].  When a DCF worker tried to ask D.A. and M.A. whether they had been brought

to see J.A. at the congregate care setting, Coleman interrupted and prevented them from

answering.  [Id. ¶ 142].  The DCF worker asked again, and D.A. and M.A. said they wanted to

see their brother.  [Id. ¶ 143].

On June 17, 2020, the Foster Care Review panel met and found that Coleman and

Almond were meeting D.A. and M.A.'s[7] needs and that they were participating in continuum

services.  [Am. Compl. ¶ 148].  Between June and July 2020, Almond and Coleman failed to

increase participation in continuum services, and conflict and behavior challenges continued.

[Id. ¶ 149].

On July 17, 2020, DCF FRAO recommended that the Juvenile Court return legal custody

of D.A. and M.A. to Almond.  [Am. Compl. ¶ 150].  Almond did not appear for the hearing.  [Id.

¶ 151].  The Juvenile Court returned legal custody of D.A. and M.A. to the couple, and it

determined that DCF FRAO should continue its supervision of the family.  [Id. ¶ 153].  That

---

[6] According to the Department's Ongoing Casework and Documentation Policy, "The schedule
of contacts should include at least monthly visits by Social Worker with the child(ren), the
child(ren)'s placement resource and the child(ren)'s parents."  [Am. Compl. ¶ 137].
[7] The Amended Complaint states that the panel found that Almond and Coleman were meeting
"D.A. and J.A.'s needs."  [Am. Compl. ¶ 148].  Given that J.A. was in congregate care at the
time, the Court assumes this is a typographical error and that the Amended Complaint intended
to state that the panel determined that they were meeting D.A. and M.A.'s needs.

same day, Coleman refused to allow DCF staff to meet with her, D.A., and M.A. outside the home saying that they had been exposed to COVID-19.  [Id. ¶ 154].  She further refused a virtual visit.  [Id.].

DCF rescheduled the home visit to July 22, 2020, during which the case management team observed Coleman berate D.A. for behaviors she said he was "purposefully and defiantly exhibiting."  [Am. Compl. ¶ 157].  DCF did not intervene and instead watched D.A. explain that he was embarrassed and upset, after which he shut down and stopped talking, even after M.A. attempted to advocate for his brother, which prompted Coleman to state that M.A. was "making her look like a liar."  [Id. ¶¶ 158–62].

In August 2020, the continuum service provider alerted DCF that Coleman reported D.A. had scratched his collar bone until it had become raw.  [Am. Compl. ¶ 163].  On August 21, 2020, DCF FRAO received an anonymous abuse and neglect report warning that the conditions of the family's home were deplorable, and that Coleman and Almond were engaging in dangerous substance abuse.  [Id. ¶ 169].  DCF management did not follow up on the report about D.A. and did not accept the report of abuse for investigation.  [Id. ¶¶ 164, 170].  DCF conducted a virtual home visit on August 24, 2020, during which the case management team observed that D.A. had a bandage covering his nose.  [Id. ¶ 172].  Coleman stated that D.A. had a self-inflicted injury, and DCF watched her instruct D.A. on what to say to the DCF case management team. [Id. ¶ 173].  At this meeting, the DCF case management team asked Coleman whether the abuse and neglect report had merit, and Coleman denied the report, stating that they were having issues with a neighbor.  [Id. ¶¶ 175–76].

On September 14, 2020, Coleman and Almond brought M.A. to the hospital in Rhode Island for an injury that Coleman reported was self-inflicted.  [Am. Compl. ¶ 181].  M.A. was

admitted overnight for observation and discharged the next day.  [Id. ¶ 182].  The DCF case

management team conducted a virtual home visit on September 25, 2020, during which D.A.,

who was on video, refused to speak.  [Id. ¶ 183].  Coleman reported that D.A. was having

behavioral issues and expressed concern.  [Id. ¶ 186].

Between March and October 2020, D.A. and M.A. were enrolled students with FRPS,

[Am. Compl. ¶ 189]; but neither boy received any academic instruction or related special

education services during the seven months that they were enrolled, [id. ¶ 194].  On October 1,

2020, FRPS dropped Chromebooks off at the apartment.  [Id. ¶ 198].  On October 5 and October

14, 2020, a teacher with FRPS contacted the DCF case management team to say that D.A. and

M.A were not logging in to school.  [Id. ¶ 200].

On October 21, 2020, the Fall River Police Department received a 911 call concerning an

unresponsive child at the apartment.  [Am. Compl. ¶ 201].  First responders arrived to find D.A.

and M.A emaciated, battered, abused, and severely neglected in a filthy, overcrowded one-

bedroom apartment riddled with drug paraphernalia and hundreds of glassine baggies with traces

of fentanyl and heroin.  [Id. ¶ 202].  D.A. was unresponsive.  [Id. ¶ 203].  He, at age fourteen,

[id. ¶ 207], was wearing a diaper filled with his own waste, was covered in waste from head to

knees, had bruises on both hands, both feet, left ankle, and both knees, and had cuts on both ears

and a scrape on his shoulder blade.  He was emaciated, appearing to weigh a total of 80 pounds,

[id. ¶¶ 210–12], meaning that he had lost 60 pounds in the preceding seven months and was

grossly underweight for his age.  [Id. ¶ 219].

Both children were taken to Charlton Memorial Hospital, where D.A. was pronounced

dead.  [Am. Compl. ¶¶ 205–06].  The Office of the Medical Examiner eventually ruled that

D.A.'s cause of death was "Failure to Thrive and malnutrition due to starvation and neglect in an

adolescent with autism spectrum disorder" and ruled his death a homicide.  [Id. ¶ 220].  A doctor at the hospital further informed officers that M.A. appeared emaciated and suspected he too had been severely neglected.  [Id. ¶ 208].  The Charlton Memorial team as well as the officers contacted DCF and filed reports as to the abuse and neglect of the children.  [Id. ¶ 213].

Almond and Coleman were escorted to the Fall River Police Department to be interviewed, during which the officers learned that both M.A. and D.A. had tested positive for fentanyl.  [Am. Compl. ¶¶ 214–15].  The two were ultimately arrested.  [Id. ¶ 216].

Shortly after D.A.'s death, the Office of the Child Advocate ("OCA") began an investigation into the individual and systematic failures that led to the triplets' abuse and neglect and D.A.'s death.  [Am. Compl. ¶ 221].  On March 31, 2021, the OCA published its findings ("OCA Report"), which included twenty-six recommendations for policy, procedure, and practice improvements.  [Id. ¶ 223].  The OCA Report ultimately concluded that the triplets' abuse and injuries were the result of failures at nearly every level by DCF and FRPS.  [Id. ¶ 224].

### B.    Procedural History

Plaintiff filed the operative amended complaint in this action on October 23, 2023.  See generally [Am. Compl.].  The Commonwealth Defendants moved to dismiss on July 15, 2024, [ECF No. 29], which Plaintiff opposed on September 10, 2024, [ECF No. 45], and the Commonwealth Defendants filed a reply in support of their motion to dismiss on October 7, 2024, [ECFF No. 52].  FRPS moved to dismiss on July 22, 2024, [ECF No. 36], which Plaintiff opposed on September 10, 2024, [ECF No. 43], and FRPS filed a reply in support of its motion to dismiss on October 7, 2024, [ECF No. 53].

## II.    STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff.  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice."  MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)).  "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

III.    **DISCUSSION**

   A.    **Sovereign Immunity (Counts I, II, III, VI, and VII)**

   The Commonwealth Defendants have invoked sovereign immunity as to Plaintiff's

claims for negligence (Counts I, II, and III) and § 1983 violations (Counts VI and VII).  [ECF

No. 30 at 9–14].  Plaintiff does not contest this.[8]

   It is well established that any federal court lawsuit "in which the State or one of its

agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."

Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); see O'Neill v. Baker,

210 F.3d 41, 47 (1st Cir. 2000) ("The Supreme Court has clearly said that the Eleventh

Amendment bars federal suits by citizens against the state or state agencies."); see also Pineda v.

Dep't of Child. & Fams., No. 16-12229, 2016 WL 6661143, at *3 (D. Mass. Nov. 9, 2016)

("DCF is an agency of the Commonwealth of Massachusetts and thus is entitled to sovereign

immunity from suit in this Court.").  In addition to barring suits against DCF itself, the Eleventh

Amendment also shields state officials from being sued for damages in their official capacities.

Redondo–Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 7 (1st Cir. 2005).  There are

two exceptions to a State's Eleventh Amendment immunity: first, "Congress may abrogate a

State's immunity by expressly authorizing such a suit pursuant to a valid exercise of power," and

second, "a State may waive its sovereign immunity by consenting to be sued in federal court."

Maysonet-Robles v. Cabrero, 323 F.3d 43, 49 (1st Cir. 2003).

---

[8] Specifically, Plaintiff responds that "this Court should permit this matter to be dismissed on
Constitutional jurisdiction grounds."  [ECF No. 45 at 7].  Plaintiff appears to misunderstand the
Commonwealth Defendants' argument, which is that they are immune from suit as to the § 1983
and negligence claims before this Court.  [ECF No. 340 at 9–14].  They do not contend that they
are immune from the ADA and Rehabilitation Act claims.  [Id. at 14–16].  The Court addresses
those claims infra.

14

Neither exception applies here.  Plaintiff asserts constitutional claims against DCF and the individual Commonwealth Defendants, sued in their official capacities, under 42 U.S.C. § 1983, which does not abrogate state immunity by expressly authorizing a suit in federal court. Soares v. Mass. Dep't of Youth Servs., No. 12-10573, 2013 WL 5211556, at *3 (D. Mass. Sept. 12, 2013) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989)).  Further, the Commonwealth Defendants have not consented to Plaintiff's § 1983 claims.  Accordingly, the § 1983 claims against the Commonwealth Defendants are barred by the Eleventh Amendment.

For similar reasons, Plaintiff's state-law negligence claims against the Commonwealth Defendants are also barred.  Although Massachusetts Tort Claims Act ("MTCA") abrogates the doctrine of sovereign immunity for certain tort claims, it does so "only to the extent provided in the statute."  Titus v. Town of Nantucket, 840 F.Supp.2d 404, 411 (D. Mass. 2011).  It is well-established that the MTCA's waiver of sovereign immunity extends only to claims brought in state court.  Thus, the Commonwealth may continue to assert sovereign immunity as a defense to claims brought in federal court although this would not be a defense in state court.  See Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003) (citing Rivera v. Massachusetts, 16 F.Supp.2d 84, 87–88 (D. Mass. 1998) (citing Irwin v. Comm'r of Dep't of Youth Servs., 448 N.E.2d 721, 727 (Mass. 1983))).

As such, the Commonwealth Defendants' motion to dismiss as to Counts I, II, III, VI, and VII is **<u>GRANTED</u>**.

### B.      ADA and Rehabilitation Act (Counts IV and V)

Plaintiff brings claims against both the Commonwealth Defendants (Count IV) and FRPS (Count V) for violations of Title II of the ADA and the Rehabilitation Act.  [Am. Compl. ¶¶ 268–303].  It is these claims that confer federal jurisdiction to this Court.  To state a claim under

these provisions,[9] Plaintiff "must establish: (1) that [the triplets are] qualified individual[s] with [] disabilit[ies]; (2) that [they were] either excluded from participation in or denied the benefits of [DCF's] services, programs, or activities or [were] otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the [their] disabilit[ies]." Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000); 42 U.S.C. § 12132 (1990). "Where, as in the instant case, a plaintiff seeks compensatory damages as a remedy for violations of the RA and the ADA, it is not enough to demonstrate only that the plaintiff has made out the prima facie case outlined above." D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 269 (3d Cir. 2014).[10] Rather, Plaintiff must also demonstrate that the discrimination was intentional. Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 126 (1st Cir. 2003) ("[P]rivate individuals may recover compensatory damages under § 504 and Title II only for intentional discrimination.").

The parties here dispute what a plaintiff must demonstrate to prove "intentional discrimination" for purposes of compensatory damages. Defendants assert that Plaintiff must meet a heightened bar requiring Plaintiff to demonstrate that Defendants acted with discriminatory animus, or to "show[ ] that [Defendants] intended to discriminate against [the triplets] based on [their] disabilit[ies]." [ECF No. 30 at 15 (quoting LeClair v. Mass. Bay Transp. Auth., 300 F. Supp. 3d 318, 326 (D. Mass. 2018) (second, third, and fourth alterations in

---

[9] Although the statutes are not identical, where, as here, "their points of departure have no bearing on the case, [ ] the court will address the merits of Plaintiff's ADA and RA claims simultaneously." Partelow v. Massachusetts, 442 F. Supp. 2d 41, 47 (D. Mass. 2006); Snell v. Neville, 998 F.3d 474, 498–99 (1st Cir. 2021); Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 11 n.1 (1st Cir. 2004).

[10] Plaintiff also seeks punitive damages, [Am. Compl. at Prayer for Relief C], which are not available under Title II of the ADA. Nieves-Marquez, 353 F.3d at 126.

the original)); see also ECF No. 37 at 8–9].  Plaintiff responds that the proper inquiry is whether Defendants acted with "deliberate indifference" to the boys' autism.  [ECF No. 45 at 13–14; ECF No. 43 at 11–13].

The First Circuit has left "open" the question of "whether deliberate indifference is enough to support recovery of monetary damages under Title II."  Gray v. Cummings, 917 F.3d 1, 17 (1st Cir. 2019) (reiterating prior holding that "under Title II, non-economic damages are only available when there is evidence 'of economic harm or animus toward the disabled'" but declining to "parse whether [the Court's] use of the word 'animus' demands more than a showing of deliberate indifference" (quoting Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 17 (1st Cir. 2006))).  District courts interpreting First Circuit precedent have applied both standards. Compare Lazarre v. Turco, No. 18-cv-12260, 2020 WL 7405733, at *8 (D. Mass. Dec. 17, 2020) ("Many circuit courts have held that the applicable standard for proving intentional discrimination is one of deliberate indifference . . . the First Circuit appears to have adopted the more stringent standard of 'discriminatory animus.'" (quoting Cox v. Mass. Dep't of Corr., No. 13-cv-10379, 2018 WL 1586019, at *7 (D. Mass. Mar. 31, 2018))); and LeClair, 300 F. Supp. 3d at 325–26 (same); with Doe v. Bradshaw, 203 F. Supp. 3d 168, 191 (D. Mass. 2016) ("The First Circuit has suggested that 'deliberate indifference' is enough to satisfy this requirement of intentional discrimination."); and Lewis v. Spurwink Servs., Inc., No. 2:22-cv-00054, 2022 WL 17454078, at *6 (D. Me. Dec. 6, 2022) (same).

Proving discriminatory animus "requires a showing that defendant intended to discriminate against plaintiff based on his disability."  LeClair, 300 F. Supp. 3d at 326. Deliberate indifference, on the other hand, "does not require a showing of personal ill will or animosity toward the disabled person."  Id. (internal quotation omitted).  "Rather, the test for

deliberate indifference is comprised of two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that . . . likelihood.'" Id. (citing Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1229 (10th Cir. 2009)).  The relevant inquiry under a deliberate indifference standard is "whether the individuals responsible for [] access [to relevant programs or services] actually knew that [each boy's] rights as a disabled person were being violated, or were likely to be violated, and failed to take the necessary steps to ensure [their] access to the relevant programs and services."  Cox, 2018 WL 1586019 at *8; see also B. S. ex rel. Justin S. v. Waxahachie Indep. Sch. Dist., No. 22-10443, 2023 WL 2609320, at *11 (5th Cir. Mar. 23, 2023) (plaintiff who fails to request an accommodation can prevail by showing "the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents") (internal quotation omitted).  In contrast, allegations regarding what a defendant "should have known[,] rather than what it actually knew" are not enough.  Cent. Dauphin Sch. Dist., 765 F.3d at 270.

### 1.   Commonwealth Defendants

Reading the Amended Complaint's allegations generously, as the Court must on a motion to dismiss, Hutcheson, 647 F.3d at 383, Plaintiff has adequately pled that the Commonwealth Defendants acted with deliberate indifference to D.A. and M.A.'s autism.[11]  Plaintiff has pled that DCF knew that (i) the boys were autistic, see, e.g., [Am. Compl. ¶ 180]; (ii) they were struggling to communicate during virtual home visits, [id. ¶¶ 128–29, 142–45, 157–62, 173]; (iii)

---

[11] As discussed infra, the Amended Complaint establishes that, after J.A. refused to return to the home, DCF adjusted its placement plans and allowed him to remain in congregate care.  [Am. Compl. ¶ 96].  Given that J.A. was given the accommodation he requested, Plaintiff has not adequately alleged that the Commonwealth Defendants were deliberately indifferent to his autism.

repeated physical injuries were occurring in the home, and some of those arose from altercations with Coleman and Almond, who more than once attributed the incidents to the boys' alleged oppositional behavior, [id. ¶¶ 91, 132–33, 141–42, 163–64 172–74, 177, 181–84]; (iv) at least one boy, J.A., had requested not to be returned to the home, [id. ¶ 96]; (v) J.A. remained in congregate care placement after that request, [id.]; and (vi) D.A. and M.A. had been doing well in their congregate care placement before being removed, [id. ¶ 104].  Plaintiff has further pled that, even armed with that knowledge, DCF "dismissed and pathologized [J.A.'s] self-advocacy as a stereotype of autism," [id. ¶ 97]; "failed to consider" the physical altercations and J.A.'s "strong reaction against being placed in the apartment" when deciding to leave D.A. and M.A. in the home, [id. ¶ 98]; and otherwise failed to provide appropriate intervention during home visits to allow D.A. and M.A. to communicate, [id. ¶¶ 129, 145, 157–58, 162, 177, 184].

Although D.A. and M.A., as fourteen-year-old children, did not formally request accommodations to their living situation or the structure of their home visits, the facts as pled, taken together, plausibly allege that DCF was on notice of the fact that the boys' rights were at risk of being violated.  J.A. requested an accommodation, and, despite understanding that the accommodation request arose at least in part from J.A.'s autism, [Am. Compl. ¶ 97], DCF failed to consider whether the other two boys, who had been left in a substantially similar situation, also needed any sort of accommodation.  Moreover, DCF failed to reevaluate their situation even in light repeated physical and verbal incidents in the home that Almond and Coleman were attributing to the boys' behavior.  These repeated failures are sufficient for deliberate indifference.  C.f. LeClair, 300 F. Supp. 3d at 326 (holding "isolated instance of improper activity, without more" was insufficient for deliberate indifference).

That said, Plaintiff's allegations against the Commonwealth Defendants do not satisfy the heightened bar of the discriminatory animus test because Plaintiff has not pled facts from which the Court can infer that the Commonwealth Defendants held any animus towards the boys based on their disabilities or intended to discriminate against them.  Lazarre, 2020 WL 7405733 at *8. As to the Commonwealth Defendants being sued in their official capacities, Plaintiff makes no allegations that these defendants personally held disability-based animus against the boys or otherwise intentionally discriminated against them based on their disabilities.  See generally [Am. Compl.].  Regarding DCF, while Plaintiff has pled that the department made a series of questionable, indifferent, and arguably neglectful decisions regarding the boys, Plaintiff does not link these decisions to animus towards their autism.[12]  Plaintiff does not allege, for instance, that the boys were returned to Almond and Coleman because it would have been too difficult to find a different placement for three boys with autism.  Rather, the only allegation that directly connects the Commonwealth Defendants' decision-making to the boys' autism is a finding from the OCA Report, which states that "DCF Fall River failed to possess the basic knowledge and understanding of Autism Spectrum Disorder that significantly impacted their ability to make decision[s] in the boys best interest."  [Id. ¶ 225].  In other words, DCF treated these boys as if they did not have autism, which, while plausibly constitutes deliberate indifference for the reasons articulated supra, does not make out animus.  Carmona-Rivera, 464 F.3d at 18 ("The record is devoid of evidence or reasonable inferences that these delays and failures to provide

---

[12] As noted above, Plaintiff alleges that DCF "dismissed and pathologized [J.A.'s] self-advocacy as a stereotype of autism," [Am. Compl. ¶ 97], which arguably sounds in animus.  DCF ultimately accommodated J.A., however, by allowing him to remain in congregate care placement, [id. ¶ 96], and Plaintiff has not pled any similar allegation concerning DCF's perspective on D.A. or M.A's autism.  As such, this allegation, while a closer call, does not rise to the level of discriminatory animus.

accommodations . . . were anything more than the result of a slow-moving bureaucracy or that they were intentionally undertaken by the defendants to purposefully discriminate against [plaintiff] because of her disability").

Because Plaintiff has successfully pleaded deliberate indifference, the Commonwealth Defendant's motion to dismiss Count IV is **<u>DENIED</u>** without prejudice to their ability to raise their arguments regarding compensatory damages again at a later point in the litigation.[13]  Given the need for a further developed factual record regarding animus, the Court, at this stage, declines to decide which level of scrutiny would govern, as such a decision would not be necessary if Plaintiff proves the animus necessary to satisfy either formulation of intentional discrimination.  See, e.g., Garcia Castro v. Puerto Rico, No. 3:20-cv-01065, 2024 WL 3179551, at *10 (D.P.R. June 26, 2024) ("At the motion to dismiss stage, concrete evidence of animus is not necessary."); Lewis, 2022 WL 17454078 at *7 (motion to dismiss denied because "while it is premature to rule on the standard that will be applied going forward given the state of the briefing, it is certainly possible, if not likely, that deliberate indifference will suffice" and plaintiff had pled deliberate indifference); LeClair, 300 F. Supp. 3d at 326 (ADA claim dismissed where "[e]ven under a generous reading, the complaint here does not make any factual allegations that could reasonably give rise to an inference of deliberate indifference, let alone discriminatory animus").

---

[13] The Commonwealth Defendants did not brief the merits of Plaintiff's prima facie discrimination claim, focusing their argument on the availability of compensatory damages.  See [ECF No. 30 at 14–16].  As such, they have waived argument on the prima facie elements at this stage.  Montalvo-Figueroa v. DNA Auto Corp., 414 F. Supp. 3d 213, 242 (D.P.R. 2019) (because defendants did not brief certain elements of discrimination claim, those were waived for purposes of motion to dismiss).  Most notably for present purposes, there is no briefing on the issue of whether any discrimination was because of the boys' disability, even given the bare-boned allegations on this point.

### 2. FRPS[14]

Even under a generous reading, the Amended Complaint does not make any factual

allegations as to FRPS that could reasonably give rise to an inference of deliberate indifference,

let alone discriminatory animus.  LeClair, 300 F. Supp. 3d at 326.  Plaintiff makes twelve

specific factual allegations as to FRPS, [Am. Compl. ¶¶ 189–200], which allege, at most, that the

boys were enrolled in FRPS from March through October 2020, [id. ¶ 189], and that no one at

the school ever made contact with them during those seven months, [id. ¶¶ 193, 199].  Plaintiff

does not allege that FRPS knew, either through an actual request or report or through an open

and apparent need, that the boys required accommodations for their autism, or that FRPS

intentionally failed to take any action to accommodate a known need.  See generally [id.].  To the

contrary, the allegations establish that Almond and Coleman exploited the complexity of the

COVID-19 pandemic's impact on both DCF's and FRPS' transition from in-person to virtual

interactions to conceal D.A. and M.A.'s situation from FRPS, keeping the district in the dark as

to the boys' abuse and neglect and any need for accommodations.  [Id.  ¶¶ 114, 117, 225, 260,

327].  Moreover, the Amended Complaint makes clear that FRPS sought (albeit belatedly) to

assist the boys in accessing virtual instruction during the pandemic, dropping off Chromebooks

at the apartment on October 1, 2020, [id. ¶ 198], and that a teacher reported to DCF that the boys

were not logging into school when nothing changed after the Chromebooks were provided, [id. ¶

200].  Although FRPS likely could have and should have raised a red flag about the boys' lack of

---

[14] In its motion to dismiss, FRPS argues that, to the extent Plaintiff's claims against FRPS are
based on violations of the Individuals with Disabilities Education Act ("IDEA"), these claims
should be dismissed because Plaintiff failed to exhaust administrative remedies.  [ECF No. 37 at
12–16].  In opposing the motion to dismiss, Plaintiff concedes that his allegations are not based
upon violations of the IDEA.  [ECF No. 43 at 16].  As such, the Court does not address the IDEA
or administrative exhaustion in its analysis.

attendance earlier than it did, without more, the allegation that FRPS should have known about the boys' autism and corresponding need for accommodation does not establish the deliberate conduct necessary for compensatory damages.  Cent. Dauphin Sch. Dist., 765 F.3d at 270.

As such, FRPS's motion to dismiss as to Count V is **GRANTED**.

### C.    Negligence Claim Against FRPS (Counts III and VIII)

Plaintiff's remaining claims are for negligence against FRPS.  [Am. Compl. ¶¶ 258–67 (Count III), 321–28 (Count VIII)].  Under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim under [the supplemental jurisdiction statute] if — . . . (3) the district court has dismissed all claims over which it has original jurisdiction." Further, "[a]s a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." Rossi v. Gemma, 489 F.3d 26, 39 (1st Cir. 2007) (quoting Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)).  "In determining whether to retain jurisdiction on such an occasion, the court must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity." Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 48 (1st Cir. 2012).  The decision "is a 'pragmatic and case-specific' one." Id. (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996)).

Here, the Court has dismissed all the claims over which it had original jurisdiction, with the exception of the discrimination claim against the Commonwealth Defendants (Count IV)[15].

---

[15] For the time being, at the motion to dismiss stage of this litigation, the federal claims against the Commonwealth Defendants survive.  That said, if Plaintiff cannot make out discriminatory animus and the Court decides that this is the proper standard for compensatory damages or if Plaintiff cannot link any discrimination to the disability, the federal claims will not survive summary judgment.  In the early, present view of the Court, the strongest claims asserted as to all

The Court no longer has original jurisdiction over any claim against FRPS. The remaining claims against FRPS turn on questions of state law that can be more appropriately resolved in state court, particularly given that the state law claims against the Commonwealth Defendants must also proceed in state court. Further, the case is still in the early stages of litigation. The complaint has been amended, but there has been no discovery and little briefing on most of the state claims given the parties focus on the federal discrimination statutes in the briefing currently before the Court. The Court therefore declines to exercise supplemental jurisdiction over the state law claims against FRPS. FRPS motion to dismiss as to Counts III and VIII is **GRANTED**.

## IV.     CONCLUSION

For the reasons articulated above, the Commonwealth Defendants' motion to dismiss, [ECF No. 29], is **GRANTED** as to Counts I, II, III, VI, and VII and **DENIED** as to Count IV. FRPS's motion to dismiss, [ECF No. 36], is **GRANTED**.

**SO ORDERED.**

November 19, 2024                          _/s/ Allison D. Burroughs_
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE

---

defendants are the state law claims. Given that the Commonwealth Defendants and FRPS all have viable state court claims and the unsettled legal and factual questions governing the availability of compensatory damages in this case and the link between the disability and the discrimination, discussed infra, Plaintiff is reminded that he is permitted to voluntarily dismiss or seek to stay the surviving federal claims in favor of first proceeding in state court.